Helen K. DYKES, Individually and Widow for the Use and Benefit of Her and Next of Kin of Eulis S. Dykes, Deceased, Plaintiff-Appellee,

v.

RAYMARK INDUSTRIES, INC., Pittsburgh Corning Corporation, W.R. Grace Co., Defendants.

National Gypsum Company, Defendant-Appellant.

No. 84–5606.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 19, 1985.

Decided Sept. 15, 1986.

Rehearing and Rehearing En Banc Denied Nov. 3, 1986.

Erma G. Greenwood (Lead), John T. Buckingham, Kramer, Johnson, Rayson, McVeigh & Leake, Knoxville, Tenn., Lawrence T. Hoyle, Jr. argued, Hoyle, Morris & Kerr, Philadelphia, Pa., for defendant-appellant.

Michael Y. Rowland argued, Rowland & Rowland, Knoxville, Tenn., for plaintiff-appellee.

Before ENGEL and KRUPANSKY, Circuit Judges; and PECK, Senior Circuit Judge.

ENGEL, Circuit Judge.

National Gypsum Company appeals a judgment entered against it after a jury awarded plaintiffs $300,000.00 in compensatory damages and $200,000.00 in punitive damages for injuries suffered by Mr. Eulis Dykes from exposure to asbestos-containing products while on the job. Jurisdiction is premised upon diversity of citizenship and Tennessee law controls. Eulis and Helen Dykes, husband and wife, filed suit against sixteen companies engaged in the manufacture and sale of asbestos products. With the exception of National Gypsum, all defendants settled with plaintiffs prior to the verdict for a total of $503,725.00. In the final judgment entered in this case the jury award against National Gypsum was reduced to $200,000.00 after the district court applied Tennessee's Contribution Among Tort-Feasors Act, Tenn.Code Ann. §§ 29–11–101 to –106 (1968), and completely set off the compensatory award. The trial court allowed the punitive award to stand, however, upon a finding that the equitable remedy of contribution is not available to parties whose conduct was willful and wanton.

On appeal National Gypsum challenges the following four rulings made by the district court: (1) Tennessee's Contribution Among Tort-Feasors Act does not apply to punitive damages, (2) evidence of National Gypsum's conduct occurring after Mr. Dykes' last exposure to asbestos as well as the deposition of Dr. Kenneth Wallace Smith were admissible on the issue of punitive damages, (3) an exhibit marked "For punitive damages only" and sent into the jury room was not prejudicial, and (4) the "overkill" doctrine does not apply to bar punitive damages in asbestosis cases.

## I.

Eulis Dykes worked as a plasterer at Gilbert Plastering Company in Knoxville, Tennessee, from 1947 through the mid–1960's. He used the spray gun method of applying plaster which involved using an applicator attached to a hose immersed in liquid plaster. The acoustical plaster he used in some of his work contained asbestos. The district court expressly found that on several occasions Mr. Dykes was exposed to Gold Bond Sprayolite, an acoustical plaster manufactured by National Gypsum. Mr. Dykes left National Gypsum around 1965 and became a utility mechanic at Union Carbide. His work at Union Carbide included some plastering as well as the replacement of asbestos pipe insulation and asbestos boiler linings. The trial court found that Mr. Dykes' last possible exposure to asbestos was in 1967, and this finding is not challenged on appeal. He left Union Carbide in 1982 after he was diagnosed as suffering from mesothelioma, a form of chest cancer associated with the inhalation of asbestos. Mr. Dykes died from complications of his disease in November 1983, shortly after the present suit was filed in the district court.

## II.

All of National Gypsum's contentions made on this appeal challenge legal and factual rulings made by the trial court on issues bearing on punitive damages. There is no challenge made to the award of compensatory damages nor is there any cross appeal by plaintiffs challenging the application of the contribution statute to the compensatory award. Because we conclude that the trial court improperly ruled that Tennessee's Contribution Among Tort-Feasors Act does not apply to punitive damages although the award of such damages was otherwise supported by the evidence, we reverse the denial of defendant's motion to amend the judgment as it relates to the punitive award and affirm in all other respects.

A. *Applicability of Tennessee's Contribution Among Tort-Feasors Act to punitive damages.*

In 1968, the Tennessee legislature adopted, with revisions, the Uniform Contribution Among Tort-Feasors Act, 12 U.L.A. 63 (1955). Tennessee had recognized prior to 1968, however, the equitable remedy of contribution. *See Davis v. Broad Street Garage,* 191 Tenn. 320, 232 S.W.2d 355 (1950); *Huggins v. Graves,* 210 F.Supp. 98 (E.D.Tenn.1962), *aff'd,* 337 F.2d 486 (6th Cir.1964). Tennessee's version of the Uniform Act provides a right of contribution in favor of a tortfeasor who has paid more than his pro rata share of a common liability when two or more persons are jointly or severally liable therefor. Tenn. Code Ann. § 29–11–102(a), (b). Tennessee's version of the Uniform Act does not expressly exclude punitive awards. The district court below relied upon a perceived "fundamental inequity in permitting a defendant who has been adjudged guilty of wanton conduct to wholly escape damages because its codefendants early assessed their exposure and chose to enter into settlements" in denying contribution for punitive damages under the Act to National Gypsum whose conduct in this case was found by the jury to have been willful and wanton. *Dykes v. National Gypsum Co.,* No. 3–83–382, slip. op. at 15 (E.D.Tenn. May 29, 1984).

Tennessee's Act does exclude from its coverage tortfeasors who are guilty of intentional conduct which has caused an injury. Section 29–11–102(c) provides, "There is no right of contribution in favor of any tortfeasor who has intentionally caused or contributed to the injury or wrongful death." Tenn.Code Ann. § 29–11–102(c). Intentional conduct is the only standard of conduct expressly excluded from the remedy.

National Gypsum argues that the Tennessee legislature intended to deny contribution to a tortfeasor whose intentional conduct contributed to a common liability and that punitive damages awarded for willful and wanton conduct—although they are a penalty—were not intended to be excluded from coverage by the Act. The Tennessee courts are constrained to give effect to the legislative intent of the statute under review where that intent can be ascertained. *Oliver v. King,* 612 S.W.2d 152 (Tenn.1981). In *Oliver,* the Supreme Court of Tennessee stated, "Legislative intent and purpose is [sic] to be ascertained primarily from the ordinary meaning of the entire act or statute, without any forced or subtle construction to limit or expend [sic] the import of that language." 612 S.W.2d at 153 (citations omitted).

 The least forced interpretation of the language in section 29–11–102(c) is that it is intended to exclude damages for intentionally caused injury only. We cannot conceive any reading of the Act which suggests by the words used by the legislature an intent to exclude conduct falling short of intentional. This reading is supported by the language in section 29–11–102(a) which defines the right of contribution in Tennessee and sets forth the only other exceptions for persons liable for a common injury, i.e., parties who are immune from a claim by the injured party. With this exception section 29–11–102(a) applies to two or more persons who are jointly or severally liable in tort. This section makes no distinction between the standards of conduct of the joint tortfeasors.[1] The only distinction made in Tennessee's Act with respect to standards of conduct is made in section 102(c) and applies to intentional wrongdoing only. Therefore, we find persuasive National Gypsum's argument that the Tennessee legislature only intended to deny contribution to an intentional joint tortfeasor.

1. A finding of joint liability does not require identical standards of conduct on the part of the tortfeasors. As long as the injury is caused by concurrent albeit independent conduct, contribution if otherwise permissible is available to the joint tortfeasors. *Velsicol Chem. Corp. v. Rowe,* 543 S.W.2d 337, 342–43 (Tenn.1976). *See also* Restatement (Second) of Torts § 886A comment b (1977).

In adopting the Contribution Among Tort-Feasors Act the Tennessee legislature altered the common law which held that tortfeasors guilty of willful and wanton conduct could not avail themselves of the contribution remedy. *See Davis v. Broad Street Garage,* 191 Tenn. 320, 232 S.W.2d 355 (1950). While courts presume that legislatures are aware of judicial decisions on issues concerning legislation under their consideration, *see, e.g., Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), we have here more certain evidence of a legislative intent to apply the Act to damages for willful and wanton conduct. The Uniform Act offers the various states the option of applying contribution to damages for willful, wanton and intentional conduct or to intentional conduct only. The Tennessee legislature chose the latter option. Section 1(c) of the Uniform Act provides, "There is no right of contribution in favor of any tortfeasor who has intentionally [willfully or wantonly] caused or contributed to the injury or wrongful death." 12 U.L.A. 63. The Commissioners' comments to this section explain their reasons for suggesting the option. "Brackets have been placed around the words 'willfully or wantonly' so that they may be omitted in those states where by definition of the terms they mean something less than they imply and where by including them the bar of the remedy may be too broad." *Id.* at 65. Although neither party has proffered any explanation of why the legislature omitted willful and wanton conduct, a decision by the Tennessee legislature to adopt the Commissioners' reasoning would have been a rational one. Punitive damages are awardable under Tennessee law for conduct "involving fraud, malice, gross negligence or oppression ... or where a wrongful act is done with a bad motive or so recklessly as to imply a disregard for social obligations...." *Island Container Corp. v. March,* 529 S.W.2d 43, 45 (Tenn.1975). This is the standard charged by the trial judge in the present case and is indeed sufficiently broad to give pause to consider taking damages for all conduct within its reach out of the remedy. This is a legislative rather than a judicial judgment, and we are bound by the clear legislative intent since we have ascertained it.

 Mrs. Dykes contends that punitive damages, unlike compensatory ones, are awarded separately against each tortfeasor and the amount for which each is liable varies according to his culpability and ability to pay, relying on *Huckeby v. Spangler,* 563 S.W.2d 555 (Tenn.1978). The *Huckeby* case is an apportionment case and confirms the rule in Tennessee that punitive damages are private fines and may be awarded against some but not all defendants by the trier of fact. The crucial distinction, however, is that in *Huckeby* all defendants went to trial so that the evidence of the conduct of all of them was before the jury, allowing the jury to make an informed judgment as to the culpability of each of them. The present case is for contribution rather than apportionment of damages. Here, we do not know the nature of the conduct of the settling codefendants so any attempt to apportion damages must be based on pure speculation at best.

 Mrs. Dykes further argues that the punitive damages award was not based upon a common liability as defined in section 29–11–102(b). That section provides that the right of contribution exists "only in favor of a tort-feasor who has paid more than his pro rata share of the common liability...." However, distinctions between the *nature* of conduct of joint tortfeasors does not preclude a finding of common liability.[2] Where the tortious acts of two or more wrongdoers combine to produce an indivisible injury "all of the wrongdoers will be held jointly and severally liable for the entire award and the injured party may proceed to judgment against any one separately or against all in one suit." *Velsicol Chem. Co. v. Rowe,* 543 S.W.2d 337, 343 (Tenn.1976) (citing *Landers v. East Texas Salt Water Disposal Co.,* 151

**2.** *See supra* note 1.

Tex. 251, 248 S.W.2d 731, 734 (1952)); *see also Michie v. Great Lakes Steel,* 495 F.2d 213 (6th Cir.1974). The requirement of a common liability focuses on the combined effect of the several acts and not upon the nature of the conduct of the several actors. Therefore, we find Mrs. Dykes' argument based upon lack of a common liability unpersuasive.

█ We therefore disagree with the district court that the punitive award cannot be set off against the payments made by the settling codefendants. If the trial court otherwise found this case to be proper for the award of punitive damages, then the award may be set off by the amount contributed by the settling codefendants.

### B. *Sufficiency of evidence of punitive damages.*

Punitive damages are available under Tennessee law for conduct "involving fraud, malice, gross negligence or oppression ... or where a wrongful act is done with a bad motive or so recklessly as to imply a disregard for social obligations...." *Island Container Corp. v. March,* 529 S.W.2d at 45. Mrs. Dykes attempted to meet this standard by establishing that National Gypsum was aware of the dangers of asbestos exposure during and after her husband's exposure but did nothing to protect or inform employees of those dangers. She also attempted to establish that National Gypsum suppressed studies and reports documenting the risks associated with asbestos exposure. The parties do not dispute the trial court's finding that the last possible year in which Mr. Dykes was exposed to asbestos is 1967.

National Gypsum challenges in particular the admission by the trial court of two items: the deposition of Dr. Kenneth Wallace Smith, the medical director of the Johns-Manville Corporation from 1953 to 1966, and documents concerning asbestos risks executed by officials at National Gypsum after 1967.

Dr. Kenneth Wallace Smith joined Canadian Johns-Mansville in 1942 as a medical officer, became medical director there in 1946 or 1947, corporate director in 1951, and in 1953 he became the medical director for Johns-Manville Corporation. He held that post until 1966. Dr. Smith was deposed on January 13, 1976, in relation to the case *DeRocco v. Forty-Eight Insulation, Inc.,* Nos. 7880, 7281 (Pa.Ct.Common Pleas, Allegheny County 1974). The entire deposition was read into the record before the jury in the present case.

National Gypsum objects to the admission of Dr. Smith's testimony on the ground that it is hearsay, and is inadmissible former testimony under Rule 804(b)(1) which provides:

> (b) **Hearsay exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> (1) **Former testimony.** Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

Fed.R.Evid. 804(b)(1).

There is no dispute that Dr. Smith's deposition was not previously offered by or against National Gypsum. Absent these circumstances, former testimony of an unavailable declarant is admissible only if National Gypsum can be said to be a "predecessor in interest" to Johns-Manville, against whom the deposition was originally offered.

The Sixth Circuit addressed this same issue with respect to *this same deposition* in *Clay v. Johns-Manville Sales Corp.,* 722 F.2d 1289 (1983). There, the issue was whether Dr. Smith's deposition was admissible against Raybestos-Manhattan, which likewise was not a party in *DeRocco.*

In *Clay,* our court speaking through Judge Edwards adopted the Third Circuit's

816

construction of Rule 804(b)(1) and the following language:

> While we do not endorse an extravagant interpretation of who or what constitutes a "predecessor in interest," we prefer one that is realistically generous over one that is formalistically grudging. We believe that what has been described as "the practical and expedient view" expresses the congressional intention: "if it appears that in the former suit a party having a like motive to cross-examine about the same matters as the present party would have, was accorded an adequate opportunity for such examination, the testimony may be received against the present party." Under these circumstances, the previous party having like motive to develop the testimony about the same material facts is, in the final analysis, a predecessor in interest to the present party.

722 F.2d at 1295 (citing *Lloyd v. American Export Lines, Inc.,* 580 F.2d 1179, 1185 (3d Cir.), *cert. denied,* 439 U.S. 969, 99 S.Ct. 461, 58 L.Ed.2d 428 (1978)).

■ In a more recent decision, *Murphy v. Owens-Illinois, Inc.,* 779 F.2d 340 (6th Cir.1985), our court, speaking through Judge Kennedy, upheld the exclusion of the same deposition of Dr. Smith involved in *Clay* and involved here when it was offered to show the state of the art against a manufacturer which withdrew from the asbestos product market in 1953. We there held that although the company was a predecessor in interest under Rule 804(b)(1) and *Clay,* the admissibility of Dr. Smith's deposition must still be subject to the balancing test of Rule 403, Fed.R.Evid. 403, to determine whether its relevance was outweighed by its prejudicial effect. Since in *Murphy* we agreed with the district judge that the particular circumstances were different from those in *Clay,* we upheld his exclusion there of Dr. Smith's deposition. Judge Kennedy for the court in *Murphy* recognized as *stare decisis* the continuing viability of *Clay.* She characterized its holding as having "collapsed the two criteria, i.e., whether the defendant was a predecessor in interest, and whether he had

an opportunity and similar motive to develop the testimony by cross-examination into one test." 779 F.2d at 343. We view the net effect of *Clay* and *Murphy* as holding that in our circuit the fact of being a predecessor in interest is not limited to a legal relationship, but is also to be determined by the second aspect of the test under the rule: whether the defendant had an opportunity and similar motive to develop the testimony by cross-examination. In the instant case, the record shows that the trial judge was familiar with *Clay* and that he had examined the deposition before he concluded that the Smith deposition ought to be admitted. He further held that any differences in the interests of the defendants here and the defendants in *DeRocco* was a matter of degree but did not affect his decision that they were sufficiently similar to justify the use of the Smith deposition.

■ We might normally be concerned with the ruling of the trial judge here. We do not view our decision in *Clay* as establishing the admissibility of Dr. Smith's deposition for all purposes in all asbestos cases. *Clay* did not rule the deposition admissible as a matter of law. It only held that it was the type of deposition which was subject to the application of Rule 804(b)(1), and thus should have been admissible under the particular facts in *Clay.* While we agree with *Clay* that a realistic application of the rule is to be preferred over one which is formalistically grudging, we believe also that the preferred approach in determining admissibility is for the attorneys to present to the court and for the court to consider the circumstances under which the original deposition was taken so that a full understanding of the motives in the first case can be obtained. Some of the motives of the defendants can be understood from the very limited cross-examination which appears in the Smith deposition, but very little otherwise is shown in our record or is shown either in *Clay* or in *Murphy.*

■ What is more important, however, is the question of potential prejudice that can accrue to a defendant against whom a deposition is introduced which the defendant never had an opportunity to adequately refute. Under such circumstances, we think it is incumbent upon counsel for the defendant when objecting to the admissibility of such proof to explain as clearly as possible to the judge precisely why the motive and opportunity of the defendants in the first case was not adequate to develop the cross-examination which the instant defendant would have presented to the witness. Thus, we would have been much more impressed with the defense's objections had they articulated before the trial court in the first instance, and later before us, precisely what lines of questioning they would have pursued. While National Gypsum here points to certain areas of difference between its situation and that of Johns-Manville, much of its argument before us was not presented to the district court, nor are we told precisely what lines of questioning National Gypsum would have pursued had it had the opportunity. We do not doubt that the trial judge here understood that he was not bound as a matter of law to admit the document in every case and we do not doubt he would have carefully considered any such factors, if they existed and had been pointed out to him at the time. We believe that it was the responsibility of National Gypsum to make this showing in the district court if it wished later to seek a retrial in which the evidence was to be excluded.

We further comment that we are aware of the great risk which might normally attend the use of a deposition of an expert who is no longer available for cross-examination. Expert witnesses all too often may be obtained on any subject and may speak with great authority and express opinions very wide in scope. When they are not adequately cross-examined, even though an opportunity is present, experts are often prone to create too heavy an aura of authoritativeness. Further, it should rarely be necessary to use the purely opinion testimony of an expert who testified in an entirely different case; and the dangers are correspondingly great that, where there exists a wide variety of opinion, an alert attorney may simply search out expert testimony which he conceives to be favorable to his cause and which he knows to have been made by a witness who is no longer, through death or otherwise, available to testify. Obviously, Rule 803 is not designed to deprive the opposite party of the historic right of cross-examination; rather, it is intended to permit parties to employ proof and testimony which is essentially reliable, cannot be effectively obtained in any other manner, and whose relevancy and probity is such that its introduction outweighs the possible prejudicial value which may result from denying cross-examination.

■ Here, the testimony of Dr. Smith is not so much the testimony of any expert who is giving opinions, as it is the testimony of a very knowledgeable person who was aware of the historical development of the specialized subject matter under examination. We believe that the very limited cross-examination of which the counsel in the original *DeRocco* case availed itself reflects its correct conclusion that most of Dr. Smith's testimony did relate to historical facts and was of a type which was not subject to refutation. Indeed, nothing in the argument before us or before the district court challenges the accuracy of the historical statements made by Dr. Smith, and for this additional reason we believe it was not an abuse of discretion for the trial judge here to have admitted the deposition. As observed by Judge Kennedy, "Smith, as former Medical Director of the leading manufacturer of asbestos-containing products, was in a unique position to discuss the scope of knowledge available to the industry during his 20–year tenure at Johns-Manville." *Murphy*, 779 F.2d at 343.

National Gypsum also challenges the admission by the district court of documents created after 1967, the last possible date on which Mr. Dykes was exposed to asbestos. The district court admitted these documents "only to determine whether com-

bined with other evidence in the case or standing alone they demonstrate that National Gypsum is liable for punitive damages for its activities before 1967." The documents seek to bolster plaintiffs' claim that National Gypsum suppressed information about asbestos dangers. They include several letters from safety officials at National Gypsum which imply opposition to printing safety labels and a desire to dilute the language in a pamphlet proposed by Johns-Manville entitled "Recommended Health Safety Practices." These documents were created between 1968 and 1978. National Gypsum's argument is that these post-injury documents are not relevant to National Gypsum's knowledge of asbestos dangers prior to 1968.

■ We disagree with the argument advanced by National Gypsum that the case law establishes a uniform rule barring such evidence.[3] Rather, we believe that the cases reflect a case-by-case approach in ascertaining whether post-injury evidence is relevant to defendant's culpability. Evidence is relevant if it tends to make the existence of any fact that is of consequence to the action more probable than not, Fed. R.Evid. 401, and absent some statutory or common law bar the trial judge's ruling on relevancy will not be disturbed unless based on an abuse of discretion. *See* Weinstein's Evidence ¶ 401[01] n. 4 (compiling cases). It does not logically follow simply because the proffered evidence seeks to establish some act occurring after the injury that the evidence cannot make the fact of the pre-injury conduct more probable than not. *See* 2 Wigmore, Evidence § 437 (Chadbourne rev. 1979). The district court stated its reasons for allowing the jury to examine these documents if and when they reach the issue of punitive damages:

> Thus, the issue, as we viewed it at trial and as we view it today, is this. There was substantial circustantial [sic] evidence that defendant knew or should have known that its asbestos-containing

products constituted a significant potential health hazard during the period in which plaintiff's decedent used them. However, defendant took no steps to explore or cure that hazard during that period. However, *after the exposure period,* defendant generated a wealth of documents which demonstrate that it wished to avoid dealing with the problem, and which, we concluded in a document-by-document review, circumstantially demonstrated that defendant's attitude as reflected therein was *consistent with its position of nonactivity during the period of plaintiffs' exposure.* Did, then, the fortuity of plaintiff's decedent's having stopped using National Gypsum products prevent the jury from considering whether the later-generated documents provided a basis for inferring that defendant acted wilfully or recklessly during the exposure period?

*Dykes v. National Gypsum Co.,* slip op. at 18 (emphasis added).

■ This passage shows that the district court examined the post-injury documents and concluded that some foundation for their admission was established, i.e., an attitude consistent with that which the plaintiffs claim existed prior to the injury. Since this foundation was established, we cannot say that the trial court abused its discretion in admitting the documents on the issue of punitive damages.

C. *Prejudicially marked exhibits.*

■ Portions of the above-mentioned exhibits were read to the jury during the trial. These portions were highlighted in yellow marker and sent into the jury room marked "Admitted for punitive damages only." In his final instructions the district judge informed the jury of the purpose of the post–1967 evidence; that it was admitted to show that National Gypsum was or should have been aware of the hazards of asbestos, that the jury should consider oth-

---

**3.** The cases relied upon for this proposition are *Litton Systems, Inc. v. A.T. & T. Co.,* 700 F.2d 785 (2d Cir.1983); *Arceneaux v. Texaco, Inc.,* 623 F.2d 924 (5th Cir.1980); *Beard v. Mitchell,* 604 F.2d 485 (7th Cir.1979); *Johnson v. Husky Industries, Inc.,* 536 F.2d 645 (6th Cir.1976); and *Thomas v. American Cytoscope Makers, Inc.,* 414 F.Supp. 255 (E.D.Pa.1976).

er evidence to establish punitive damages, and that the post–1967 documents were offered to show pre–1967 conduct. National Gypsum argues that the documents were unduly suggestive and that the trial judge erroneously relied upon Fed.R.Evid. 1006 for their admissibility in that form.

We find no abuse of discretion in the procedure used by the district court. The judge explained, "The documents were voluminous, and the highlighting simply served to bring to the jury's attention those portions of the documents relevant to their deliberation." *Dykes,* slip op. at 20. The judge's instruction clarified for the jurors the reason the documents were separated from the other evidence admitted in the case as well as the reason they were marked in yellow. Also, it is not clear that the trial judge relied upon Rule 1006, he refers to it by analogy as other authority for the admission of summarized evidence. Admission of the documents in this manner was not reversible error.

**D.** *Availability of punitive damages in asbestos cases.*

█ National Gypsum urges the court to accept the "overkill doctrine" accepted by some courts in asbestos cases. This theory holds that successive compensatory awards are sufficient to achieve the exemplary and punitive purpose, so that allowing successive punitive awards only creates overkill and threatens the recovery of any award by subsequent plaintiffs. *See Jackson v. Johns-Manville Sales Corp.,* 727 F.2d 506 (5th Cir.1984) (applying Mississippi law).

This court has recently rejected this theory as it pertains to Tennessee law, *Cathey v. Johns-Manville Sales Corp.,* 776 F.2d 1565 (6th Cir.1985), and we are bound thereby. Therefore, we reject the theory that punitive damages are not available in Tennessee in asbestos cases.

### CONCLUSION

We conclude that the trial court correctly admitted the deposition of Dr. Kenneth Wallace Smith and the post–1967 evidence.

We also conclude that the exhibits marked "For punitive damages only" were not prejudicial. However, we disagree with the trial court's ruling that Tennessee's Contribution Among Tort-Feasors Act does not apply to punitive damages based upon willful and wanton conduct. We therefore remand this case to the trial court for application of the Contribution Among Tort-Feasors Act to the punitive portion of the award.