## Joe GOAD

v.

## MACON COUNTY, TENNESSEE; James Mercer, Sheriff; Jeff Bilbrey; Mike Jarratt; and David Sampson.

No. 2:88–0085.

United States District Court,
M.D. Tennessee,
Northeastern Division.

Sept. 28, 1989.

Guy Holliman, Farrar & Holliman, Lafayette, Tenn., and Richard M. Brooks, Carthage, Tenn., for plaintiff.

Mike Evans, Nashville, Tenn., for defendants.

## MEMORANDUM

MORTON, Senior District Judge.

Plaintiff, Joe Goad, originally brought this 42 U.S.C. § 1983 civil rights action against eight defendants. In essence, the complaint charged the defendants with violating Goad's constitutional rights through the use of excessive force and by depriving the plaintiff of reasonable medical attention while in custody as a pretrial detainee. Three defendants, Ken Sircy, Randy Carter, and the Town of Red Boiling Springs, settled with the plaintiff for the sum of $10,000. The remaining defendants proceeded to trial.

After hearing all the evidence, the court dismissed Mike Jarratt, the jailer, from the unreasonable force claim. Furthermore, defendants Jeff Bilbrey and David Sampson were dismissed from the claim for denial of reasonable medical treatment. All remaining issues were submitted to the jury. The jury then absolved Sampson and

Jarratt of any liability. However, the jury returned a verdict against defendants Jeff Bilbrey, James Mercer, and Macon County on the claim of unreasonable force. Additionally, Mercer and Macon County were held liable for denial of reasonable medical treatment. Bilbrey's liability was premised upon his direct participation in the relevant incident. Mercer and Macon County, on the other hand, were held liable on the grounds that Sheriff Mercer's training of Macon County deputies and jailers was so woefully and obviously inadequate that it amounted to deliberate indifference to the needs of citizens to be protected from unreasonable force and to receive reasonable medical attention while in custody of the county.

The jury awarded $7,500 as compensatory damages for the use of unreasonable force, and $1,000 as compensatory damages for the denial of reasonable medical attention. Additionally, the jury awarded the plaintiff $5,000 in punitive damages against Jeff Bilbrey, and $6,000 in punitive damages against James Mercer. Bilbrey, Mercer, and Macon County now move this court to reduce the jury verdict by the amount of settlement received from defendants Sircy, Carter, and Red Boiling Springs. As explained below, the court grants the motion in part.

While 42 U.S.C. § 1983 provides for awards of damages for violations of civil rights, it unfortunately does not address such detailed damages questions as the settlement set-off problem currently before the court. However, neighboring 42 U.S.C. § 1988 does at least provide a basic analytical framework for resolving problems such as these. The statute states as follows:

> The jurisdiction in civil ... matters [arising under 42 U.S.C. § 1983] ... shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies ..., the common law, as modified and changed by the constitution and statutes of the State

wherein the court having jurisdiction is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause....

Thus, the first step of the analysis must be to determine whether federal law addresses the question of settlement set-offs. If it does not, the next step is to determine state law's position on the issue. Third, the state law must be examined for consistency with federal law and especially with the policies and purposes of 42 U.S.C. §§ 1983 and 1988. *See Robertson v. Wegmann,* 436 U.S. 584, 589, 590, 98 S.Ct. 1991, 1995, 56 L.Ed.2d 554, 561 (1978); *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 240, 90 S.Ct. 400, 406, 24 L.Ed.2d 386 (1969). If there is no inconsistency between these two bodies of law, the state law solution to the problem will be applied. If there is an inconsistency, the state law must be rejected, and this court must fashion an appropriate remedy to carry out the congressional purposes behind the civil rights legislation.

At step one of the analysis, the first thing a review of federal law reveals is that the issue of set-offs does not even exist if there was never "any basis for joint liability" of the settling defendants and the defendants against whom the jury returned a verdict. *Dobson v. Camden,* 725 F.2d 1003, 1006 (5th Cir.1984) (en bank). *See also Wren v. Spurlock,* 798 F.2d 1313 (10th Cir.1986); *Moffett v. Gene B. Glick Co., Inc.,* 621 F.Supp. 244 (D.C.Ind.1985); *Hoffman v. McNamara,* 688 F.Supp. 830 (D.Conn.1988). Cf. *Watts v. Laurent,* 774 F.2d 168 (7th Cir.1985) (does not discuss set-offs, but discussion of indivisible injuries supports proposition that such is a prerequisite to set-off). In other words, if the claims against the settling defendants were separate and distinct claims from the trial defendants, the losing trial defendants cannot call for a set-off. On the other hand, if the claims or injuries were indivisible, the propriety of a set-off must be explored in more depth. Furthermore, even if the issue of the requirement of joint

liability were best reserved until step two of the analysis, or the examination of state law, the court notes that Tennessee law not surprisingly places joint liability as a prerequisite to set-offs. *See Dykes v. Raymark Industries, Inc.*, 801 F.2d 810 (6th Cir.1986) (diversity action discusses contribution and set-off for settlement interchangeably, but nevertheless implicitly recognizes joint liability as a prerequisite to either). Additionally, such a conclusion is only common sense. If two distinct wrongs are committed, it is ridiculous for one wrongdoer to have his liability reduced by the fact that another wrongdoer has compensated the victim for a totally separate wrong.

However, an examination of both the complaint and pretrial order in this case reveals that the plaintiff was pursuing a joint liability theory against all the defendants. All defendants were lumped together in the charge of unreasonable force as well as the charge of denial of medical attention. Nothing indicated that separate claims were being asserted against the settling defendants. After the instant motion was filed, the plaintiff argued that he was asserting a separate claim of unlawful arrest against settling defendants Randy Carter and Red Boiling Springs, but a fair reading of the complaint and pretrial order does not support this position. True, the arrest is mentioned, but only in the sense of providing a historical background or context for subsequent actions which violated the plaintiff's constitutional rights. The arrest reference simply explains why the plaintiff ended up at the jail where the unlawful actions occurred. Neither the complaint nor the pretrial order allege that the arrest was unlawful. Accordingly, the court concludes that the only claims asserted against the settling defendants were the same unreasonable force and denial of medical treatment claims asserted against the other defendants.

Furthermore, the plaintiff did not attempt to divide those two claims into separate force and medical claims against separate defendants. Rather, all defendants were grouped together in the treatment of the unreasonable force claim, and all were again grouped together in the treatment of the denial of medical treatment claim. Furthermore, nothing in the allegations indicated that the role of the settling defendants was any more different from the role of the trial defendants than the role of various trial defendants was different from each other.[1] In fact, the role of the settling defendants was more similar to the role of certain trial defendants than the role of those same trial defendants was similar to other trial defendants. Yet, the plaintiff conceded the appropriateness of joint liability for the more distinguishable groups of trial defendants by never objecting to the jury instructions and verdict form which presented the claims in terms of joint liability. If it was appropriate to present the claims against the trial defendants in terms of joint liability, it would have also been proper to consider the settling defendants as potentially jointly liable with the other defendants. Thus, the court concludes that the defendants have overcome the first obstacle to a set-off—the requirement of indivisible claims or joint liability. Of course, the examination of federal law must move beyond this point. Joint liability or an indivisible claim is simply a prerequisite to considering whether set-off or credit for settlement is appropriate. Once the prerequisite has been met, the court must go further and determine, in accord with 42 U.S.C. § 1988, whether federal law addresses the set-off question, or whether federal law is "deficient" in this matter, thereby creating a need to examine state law.

■ Certainly neither 42 U.S.C. § 1983 nor any other civil rights provision in that chapter addresses the question of set-offs.

---

1. Allegations against the settling defendants, and not the proof at trial, are the critical factor. The proof could have been much different if the settling defendants had actually gone to trial. Consequently, despite the fact that the proof at trial in this matter suggested that the settling defendants had no role in the denial of medical treatment, the court must accept the complaint's allegations of a role. Accordingly, if a set-off is otherwise appropriate for the unreasonable force claim, it is also appropriate for the medical treatment claim.

Neither does the statute or chapter create a general framework or scheme which clearly authorizes or forbids set-off. In fact, the question is not even addressed. Likewise, there is no other general federal statute that speaks to the issue. Thus, if federal law is not "deficient," it must be because federal common law deals with the issue. Yet, there is a split of authority concerning whether federal common law can be used at this stage of the analysis. Some courts hold that 42 U.S.C. § 1988's exhortation to "enforce [§ 1983] in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect" instructs courts to use a federal common law remedy at this first stage of the analysis. Other courts disagree.

The lone Circuit Court case to determine that federal law was not deficient in the area of set-offs was *Miller v. Apartments and Homes of N.J., Inc.*, 646 F.2d 101 (3d Cir.1981). In *Miller*, the Third Circuit avoided a deficiency problem by fashioning a federal common law remedy to fill the void on this damages question left by the civil rights statutes. The problem with this approach, however, was later pointed out by a Fifth Circuit panel in *Dobson v. Camden*, 705 F.2d 759, 763 (5th Cir.1983) (*Dobson I*—reversed on other grounds by an en banc court) when it stated that

> "[i]f [the civil rights] statutory scheme carried with it the power to generate common law rules, § 1988's reference to a federal law deficiency would make no sense."

If the courts were free to fashion a federal common law solution to the problem, there would never be a need to look to state law because a court can always fashion some common law to fill the voids left by any statutory scheme. Yet, the drafters of 42 U.S.C. § 1988 clearly envisioned the courts to be looking to state law. Otherwise, they would not have inserted the authorization to look to the state "common law, as modified and changed by the constitution and statutes of the State." Thus, the Miller court's free fashioning of federal common law is unsatisfactory.[2]

Nevertheless, the position on the completely opposite side of the spectrum is not satisfactory, either. This view holds that the court may never look to more than federal statutory law or the schemes created by the statutes before it turns to state law for help. The problem with this position is that § 1988 directs the courts, in the first instance, to enforce the civil rights provisions "in conformity with the laws of the United States," and "laws of the United States" is generally understood to include more than statutory law and the implications of any statutory scheme. Rather, the phrase is ordinarily construed to include common law as well. Thus, despite the fact that § 1988 appears to create a major role for state law as discussed above, the same provision would also seem to envision some reliance upon federal common law.

At first glance, *Dobson I, supra,* may appear to be articulating the extreme position of forbidding any use of federal common law until the court has already attempted to use state law. The same is true for *Johnson v. Rogers*, 621 F.2d 300 (8th Cir.1980) and *Hoffman v. McNamara*, 688 F.Supp. 830 (D.Conn.1988). In each of these cases, the court concluded that federal law was deficient on the subject of settlement set-offs in civil rights cases. Likewise, each court rejected the *Miller* approach of fashioning a federal common law solution. Instead, the courts, upon declaring the existence of a deficiency, immediately turned to the second and third steps of the three-part analysis articulated earlier. At the second step, the courts would examine state law. Then at the third step, they would determine whether the state law was consistent with the federal. Of course, in a sense this third step is similar to *Miller*'s fashioning of a common law remedy at the first step, but the important distinction is that this occurs after first

---

2. The *Miller* decision as a whole is also damaged by the fact that subsequent Supreme Court decisions destroyed the authority of a Third Circuit Title VII case heavily relied upon by the *Miller* court. *See Northwest Airlines, Inc. v. Transport Workers*, 451 U.S. 77, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981). Cf. *Glus v. G.C. Murphy Co.*, 629 F.2d 248 (3d Cir.1980).

trying to borrow from state law. Thus, this results in a more limited use of judicial remedy creating, if any at all.

A more scrutinizing look at *Dobson I, Johnson,* and *Hoffman,* however, reveals that their rejection of the *Miller* approach is not necessarily an adoption of the opposite extreme which completely eliminates common law from step one of the analysis. Rather, the three opinions may be viewed as consistent with a "middle-ground" approach. This middle-ground approach rejects the *Miller* solution of *fashioning* a common law answer to the problem at step one as inconsistent with the prominent role of state law as envisioned by § 1988. However, it does not forbid all use of federal common law at this stage. Rather, the courts are free to use federal common law at step one of the § 1988 analysis if there is already a clear and applicable common law principle in existence at that time. This is especially true if the common law principle was already firmly established by the time the relevant civil rights statute was enacted. In such cases it may be safely assumed that the drafters enacted the statute within the context of the common law already in existence.

In other words, only the *creating or fashioning* of a federal common law remedy at step one is objectional to this middle-ground construction of § 1988. If there is a clear common law principle already in existence, the court should apply it. If there is not, the court should then look to state law. This view preserves § 1988's significant role for state law without doing violence to the general understanding of the phrase "laws of the United States." Thus, this court adopts this middle-ground approach even if not expressly articulated by *Dobson I, Johnson,* and *Hoffman.*

This view is also consistent with the Supreme Court's opinion in *Robertson v. Wegmann,* 436 U.S. 584, 98 S.Ct. 1991, 56 L.Ed.2d 554 (1978). *Robertson* was a civil rights action which the defendant moved to dismiss on the ground of abatement after the plaintiff died. Both lower courts concluded that federal civil rights law was "deficient" on the issue of survivorship of civil rights actions. Both also concluded that application of the relevant state law would result in abatement of the action. However, they also concluded that such abatement was inconsistent with the basic purposes of the civil rights legislation. Consequently, the trial court refused to apply state law and accordingly denied the motion to dismiss. The Fifth Circuit then affirmed on an interlocutory appeal. However, the Supreme Court reversed. While conceding that some state law abatement provisions might be inconsistent with federal civil rights legislation, the court found that the particular narrow provision then at issue did not. Accordingly, the court applied state law and reversed the denial of dismissal.

In deciding, the Supreme Court noted that "one specific area not covered by federal law is that relating to 'the survival of civil rights actions under § 1983 upon the death of either the plaintiff or the defendant.'" *Id.* at 589, 98 S.Ct. at 1994, 56 L.Ed.2d at 560 (citation omitted). In other words, at the first step of the § 1988 analysis, the court appeared to conclude that federal law was "deficient" on the subject of survivorship of actions. By proceeding to apply state law, the court also appeared to implicitly reject the idea of fashioning, at least at step one, a common law answer to the problem.

The *Robertson* dissent viewed the majority opinion as going even farther. They interpreted the court's decision as rejecting any use of the federal common law at stage one, not just rejecting the creation of a federal common law at that time. Writing for the three-member dissent, Justice Blackmun wrote:

> I do not read the emphasis of § 1988, as the Court does, ... to the effect that the Federal District Court "was required to adopt" the Louisiana statute, and was free to look to federal common law only as a secondary matter.

The dissent then went on to essentially advocate trying to fashion a common law remedy before declaring a federal law deficiency and moving to the realm of state law.

This court concludes the dissent was reading the court's self-described "narrow" holding too broadly. The mere fact that the court declined to fashion a common law solution to the survivorship problem does not necessarily mean that courts are not free to use federal common law at step one when there is a clearly established common law principle in existence. Likewise, such a possibility is not eliminated by the fact that the majority obviously viewed state law as playing a very important role in the analysis. If there had been a clearly established common law principle on survivorship of actions, the court could have easily applied that principle in complete consistency with its opinion rather than turning to state law.

Additionally, it is important to note that the Court's guidance may be somewhat limited by the concessions of the litigating parties in *Robertson*. As noted above, the dissent wanted to avoid a federal law deficiency by fashioning a common law remedy. In a responding footnote, the majority expressly noted the dissent's argument that federal law does not have to be deficient just because there is no statutory guidance or provision. To this, however, the Court simply stated: "[b]oth courts below found such a deficiency, however, and respondent here agrees with them." *Id.* at n. 4. Arguably then, the guidance conceivably could have been different had the procedural posture been different.

The *Miller* court even found an additional reason for limiting the *Robertson* opinion. While the *Miller* court accepted that *Robertson* rejected the idea of fashioning a federal common law remedy to the survivorship problem at step one, the *Miller* court limited the holding to the survivorship problem which it found less naturally left to judicially created solutions. The question of set-offs and contribution, on the other hand, was deemed to be an issue traditionally and naturally left to the common law. Thus, the *Miller* court concluded that it was proper to create a federal com-

mon law remedy to the set-off problem without any examination of state law.

While *Miller* does represent a credible reading of *Robertson*, this court concludes that *Robertson* envisions a more prominent role for state law than does *Miller*. Thus, while not accepting the dissent's view of *Robertson* as excluding any reference to federal common law at step one, this court does conclude that federal law should not be created at step one. If there is a firmly established federal common law principle in place, it may be used. If not, the court should attempt to borrow from state law. This view is not only consistent with *Robertson*, but it also represents the best balance between § 1988's broad direction to enforce the civil rights laws in conformity with the laws of the United States on the one hand, and the prominent instruction to borrow from state law on the other.

Even with the allowance to apply federal common law at step one if there is clearly established and relevant common law, the court still agrees with *Dobson I*, *Johnson*, and *Hoffman* that federal law is deficient.[3] Simply put, there is no clearly established federal common law of settlement set-offs. Thus, this court must move to step two of the § 1988 analysis—an examination of Tennessee state law.

■ An examination of state law leads to Tennessee Code Annotated § 29–11–105:

> (a) When a release or covenant not to sue ... is given in good faith to one (1) of two (2) or more persons liable in tort for the same injury ...
>
> (1) It does not discharge any of the other tort-feasors from liability for the injury ... unless its terms so provide; but it reduces the claim against the others ... in the amount of the consideration paid for it....

This provision is very straightforward and requires no detailed analysis. Applied to the case at hand, Tennessee law would require this court to reduce the jury verdict

---

**3.** Thus, even though this court is adopting the "middle-ground" approach to the construction of § 1988, the outcome in this case will automatically be the same as the outcome of the more extreme approach of completely eliminating all reference to federal common law at step one.

by the $10,000 amount already received by the plaintiff. The only arguable limitation is that the statute may not have been intended to apply to punitive damage awards. However, as explained below, that is a question this court need not decide. An application of the set-off to punitive damages would be inconsistent with the policies and purposes of the civil rights legislation. Thus, regardless of Tennessee law's answer to the question, this court cannot allow a set-off against punitive damages.

First, however, the court concludes at step three of the analysis that applying Tennessee created set-offs to compensatory damage awards does not create any inconsistency with 42 U.S.C. § 1983. The Supreme Court has recognized that the primary goal of 42 U.S.C. § 1983 is to compensate victims for the injuries of having their civil rights violated. *See Memphis Community School District v. Stachura,* 477 U.S. 299, 307, 106 S.Ct. 2537, 2543, 91 L.Ed.2d 249, 259 (1986). This goal or underlying purpose of the civil rights legislation is in no way compromised by applying settlement monies as a credit or set-off to a subsequent jury award of compensatory damages against the nonsettling defendants. On the contrary, the theoretical purity of this purpose is actually tainted by a refusal to apply a set-off.

In theory, injuries can be compensated by some sum of money. Of course, it is sometimes very difficult to attach a monetary value to many types of injuries, especially such amorphous harms as emotional injury and pain and suffering. Nevertheless, our system defers to the judgment of the jury as the true value of an injury, and payment of the jury-determined amount is therefore deemed full compensation of the injury. If, however, a plaintiff receives the jury-determined value of the injury *and* an additional amount through settlement for a single, indivisible injury, the plaintiff receives a windfall. He receives full compensation for the injury and then more compensation for the same injury. Thus, giving a set-off does not damage the goal of compensation. Instead, failure to apply the set-off to compensatory damages actually results in a failure to accurately meet

that goal. This fact suggests not only that application of Tennessee law in this case is consistent with the federal law, but it also suggests that Tennessee law actually promotes the purpose of that law.

Another purpose of civil rights legislation also deserves some attention, however. The plaintiff argues that a settlement set-off against an award of compensatory damages would severely frustrate the goal of deterrence. The court does not agree. The basic concept of compensatory damages serving as a deterrent to unlawful conduct as well as a compensation for the injuries is that the threat of compensating for the injuries will make the actor less inclined to perform the conduct. Yet, the same "quantity" of monetary threat still looms over the potential actor's head as he contemplates conduct regardless of whether the law allows for settlement set-offs or not. As a potential actor contemplates acting in conjunction with other persons, he has absolutely no assurance or indication that any of his cohorts would settle with the plaintiff if a lawsuit resulted from the conduct. Thus, he also has no assurance or indication that his own liability would be reduced because of a settlement set-off. Consequently, the possibility of compensating for the entire injury still exists as a deterrent to the contemplated act.

Interestingly, the potential actor does not even have the assurance that he will only have to compensate for his own "part" in the injury. The principle of joint and several liability acts to hold the potential defendant liable for the entire indivisible injury despite the fact that other actors also bear some of the blame. The court therefore concludes that the potential of this entire liability adequately serves the goal of deterrence even if settlement set-offs are applied against compensatory damage awards. To the extent that there may sometimes be a greater need to serve the goal of deterrence, that need can be met through the possibility of punitive damages if deemed appropriate by the jury. Accordingly, in this case the court will apply a settlement set-off to the jury's award of compensatory damages.

A different result is in order for the punitive portion of the jury verdict. If Tennessee law allows settlement set-offs against punitive damage awards, the court concludes such law is inconsistent with the basic purposes and policies of civil rights legislation. Accordingly, the court will not apply a settlement set-off against the punitive damage awards against defendants Bilbrey and Mercer. The purpose of punitive damages is to punish and deter. Furthermore, the focus is upon particular defendants rather than upon compensating a victim as is the case with compensatory damages. The focus is undistorted when set-offs are applied to compensatory damage awards because the victim still receives complete compensation. However, the focus of punitive damage awards can be completely bypassed if reduced by the amount of settlement monies received from other defendants. The target of the punitive damage award, the defendant the jury intended to punish, would escape with absolutely no punishment at all if the settlement was as large as the compensatory damage award and punitive award combined. If not as large, there would still be a lesser punishment than the jury deemed appropriate. The court concludes such a result is inconsistent with the important purpose of punishing specific violators of civil rights. Accordingly, such a result will not be allowed. Additionally, refusal to allow a set-off against punitive damages will ensure that adequate specific deterrence exists for those particular defendants which, according to the jury, need particular attention and punishment.

Applying these conclusions to the case at bar results in a complete set-off against the award of compensatory damages. The jury concluded that the "value" of the plaintiff's injuries was $8,500. In other words, a payment of $8,500 would entirely compensate the plaintiff for his loss. It would make him "whole" again. Because of the settlement, the plaintiff has already received more than complete compensation for the injuries. Thus, no further compensation for the injuries are needed from the trial defendants. However, the trial defendants still need to be punished. Accordingly, defendant Jeff Bilbrey must pay the plaintiff $5,000, and defendant James Mercer must pay the plaintiff $6,000.

An appropriate order will be entered.