**Maybell E. BANKS, as Administratrix of the Estate of her son Kenneth BANKS, and on her own behalf, Plaintiff,**

v.

**P.O. Craig YOKEMICK, Defendant.**

**No. 99 Civ. 10815(VM).**

United States District Court, S.D. New York.

Dec. 3, 2001.

Jonathan S. Abady, Emery, Cuti, Brinckerhoff & Abady, P.C., New York City, for plaintiff.

Beth Hoffman, Michael D. Hess, Corp. Counsel of City of New York, New York City, for City of New York.

Walter A. Kretz, Jr., Seiff & Kretz, New York City, James J. Skelton, Worth, Longworth, Bamundo & London, New York City, for Craig Yokemick, P.O.

Alexander Peltz, Peltz, Walker & Dubinsky, New York City, for Joanne Brown, Andrew Burns, Carlos Castro, Kevin Flynn, Patrick Gerahty, Janice Grier, Timothy Krumm, Michael Lampman, Elizabeth Lugo, and John McAndrew.

Richard E. Signorelli, Law Office of Richard E. Signorelli, New York City, for James McFarland, P.O., John O. Sullivan and Eldemiro Valle.

## DECISION AND ORDER

MARRERO, District Judge.

## BACKGROUND

Plaintiff Maybell E. Banks (hereinafter "Ms. Banks") commenced this action alleging claims under § 1983 of the Civil Rights Act, 42 U.S.C. § 1983, and under state law, in her capacity as administratrix of the estate of her son, Kenneth Banks (hereinafter "Banks"), as well as on her own

behalf.[1] She asserted several claims against the City of New York (hereinafter the "City"), nineteen named individuals and various unknown defendants, all of whom at the relevant times were employees of the New York City Police Department. The case stems from the alleged unlawful detention and use of excessive force by defendant police officer Craig Yokemick ("Yokemick") in connection with his arrest of Banks, who died from injuries he suffered during that incident.

The City, on behalf of all defendants except for Yokemick, reached a settlement for a total of $750,001 with Ms. Banks. All other defendants were released and the claims Ms. Banks had asserted against them, her own as well as those of Banks's estate, were then dismissed. The matter proceeded to trial as to Yokemick alone. The jury awarded Banks a total of $605,001 consisting of (1) $25,000 for Banks's conscious pain and suffering and $500,000 for his loss of life, both connected with the claim of use of excessive force; (2) $75,000 for Banks's pain and suffering associated with a state law claim for negligent delay in obtaining medical assistance; and (3) $5,000 on Banks's state law wrongful death cause of action, and (4) nominal damages of $1.00 on Banks's claim of unlawful arrest.

Now before the Court are Yokemick's post-trial motions for (1) judgment notwithstanding the verdict pursuant to Fed.

R.Civ.P. 50(b); (2) a credit to set off, pursuant to New York General Obligations Law . (hereinafter "G.O.L.") § 15–108 (McKinney's 2001), the full amount of the jury award against the recovery from Ms. Banks's settlement with the released defendants; and (3) indemnification pursuant to New York General Municipal Law ("G.M.L.") § 50–k (McKinney's 2001). For the reasons discussed below, Yokemick's motion for judgment as a matter of law is denied. His motion for approval of setoff is denied subject to further proceedings described below. Decision on his motion for indemnification is reserved pending the City's final determination, in the light of the judgment rendered herein, as to whether it will indemnify Yokemick for any portion of his liability.

## FACTS

The trial evidence established that Banks was riding a bicycle on 125th Street and Madison Avenue, Manhattan on October 29, 1998 when Yokemick, who was chasing Banks, threw his police radio at him, striking the side or rear of Banks's head with sufficient force to knock him off the bicycle and cause him to fall to the street. The jury also heard evidence indicating that Yokemick did not immediately disclose to other officers who arrived at the scene and drove Banks away to the police station, or to personnel at the precinct, or to ambulance attendants who la-

---

1. During the course of the trial, Ms. Banks withdrew the claims she had asserted on her own behalf, leaving for submission to the jury and involved in the instant motion the claims of Banks's estate. *See* Plaintiff's Memorandum of Law in Opposition to Defendant Yokemick's Post–Trial Motion, dated August 10, 2001 (hereinafter "Pl. Memo"), at 16–17. On this basis, the Court will not address that portion of Yokemick's motion papers devoted to objections to Ms. Banks's individual Due Process claim of right to the companionship of her son, a claim that was not submitted to

the jury. *See* Defendant Yokemick's Post–Trial Memorandum of Law, dated July 5, 2001 (hereinafter "Def. Memo"), at 7–10. Similarly, the Court does not address Yokemick's objections to Ms. Banks's post-trial motion for additur, a matter subsequently withdrawn and not discussed in Pl. Memo. Because all the claims at issue here are asserted on behalf of Banks's estate, further reference both to Banks's estate as plaintiff and to Banks individually is made hereinafter as "Banks".

ter transported Banks to the hospital, that Banks had been struck on the head by Yokemick's radio. Banks's life could not be saved by the time he was finally taken to the hospital and properly diagnosed later that day as having suffered head injuries. Hours after his arrival at the hospital he went into a coma, was pronounced brain dead two days later on October 31, 1998 and was removed from life support on November 10, 1998. An autopsy by the Office of Chief Medical Examiner determined the cause of Banks's death as having resulted from a blunt impact to the head that fractured his skull and produced brain contusions.

Yokemick did not appear at the trial. Through cross-examination he endeavored to suggest a defense that he acted reasonably, in good faith and with justification in the proper and lawful exercise of his duties as a police officer and that Banks's injury could have been caused by his head striking the pavement during the course of Yokemick's making a lawful arrest.

### STANDARD OF REVIEW
### UNDER RULE 50

A judgment as a matter of law pursuant to Rule 50 is appropriate where "there is no legally sufficient evidentiary basis for a reasonable jury to find for a party." *Merrill Lynch Interfunding, Inc. v. Argenti*, 155 F.3d 113, 120 (2d Cir.1998). The court may not reach such a determination by evaluating the credibility of witnesses or the relative weight of evidence. Rather, in assessing a motion for judgment under Rule 50, the Court must view the evidence in the light most favorable to the non-movant. *See Caruolo v. John Crane, Inc.*, 226 F.3d 46, 51 (2d Cir.2000); *see also* 9 James Wm. Moore, et al., *Moore's Federal Practice* ¶ 50.64[1] (3d ed.2000). To grant a Rule 50 application, there must be " 'such a complete absence of evidence

supporting the verdict that the jury's findings could only have been the result of her surmise and conjecture, or ... such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against [it].' " *Concerned Area Residents for the Environment v. Southview Farm*, 34 F.3d 114, 117 (2d Cir.1994) (quoting *Song v. Ives Laboratories, Inc.*, 957 F.2d 1041, 1046 (2d Cir.1992) (citations omitted)).

### DISCUSSION

### I. *RULE 50 MOTION FOR JUDGMENT*

Yokemick's motion for a Rule 50 judgment as a matter of law asserts (1) what appears to be a general challenge to the sufficiency of the evidence, as well as more specific objections contending that (2) the award of $500,000 for Banks's loss of enjoyment of life should be set aside because no basis for such a claim exists under New York law; (3) the recovery of $25,000 for Banks's conscious pain and suffering on the federal claim duplicates the $75,000 damages the jury awarded on the state cause of action that also claimed pain and suffering; (4) the pain and suffering award on the state law claim should be overturned because Banks failed to produce evidence that Yokemick owed Banks a duty to obtain adequate medical attention, and (5) Banks failed to introduce any evidence supporting the jury's award of $5,000 on the state law wrongful death action.

### A. *SUFFICIENCY OF THE EVIDENCE*

Without citing specific evidentiary grounds on which his motion rests, Yokemick made a general assertion at the close of parties' trial evidence and repeated after the jury's determination, that he was enti-

tled to judgment notwithstanding the verdict. Insofar as Yokemick's motion addresses the jury's factual findings and is intended to challenge the sufficiency of the evidence supporting the verdict, the Court rejects the motion. It is uncontested that during the chase, while Banks was on a bicycle, Yokemick threw his police radio at him, knocking Banks to the ground. Several eyewitnesses testified that they saw Banks fall onto the pavement upon being struck by the radio. Banks's medical experts on brain injuries and forensic pathology and the City's medical examiner testified that the head trauma Banks suffered, from the effects of which he never recovered and ultimately died, was consistent with his having been struck on the head with a heavy object such as the police radio in evidence. All of this testimony corroborated the results and cause of death recorded in Banks's autopsy report.

Uncontroverted evidence also established the following facts. Following his arrest, Banks was taken to the local precinct rather than to a nearby hospital. The officers who moved Banks were told, contrary to normal police practice, to bring him into the precinct through the back entrance and directly into a cell. Banks, having suffered what appeared to be an epileptic seizure soon after his arrival at the precinct, was later taken to the hospital. At no point were the officers who drove Banks to the precinct or to the hospital informed by Yokemick or anyone else that Banks had been struck on the head with a police radio, although Yokem-

ick was present on both occasions when Banks was carried away. In fact, at the precinct Yokemick referred to Banks as a prisoner "claiming" injuries. Absent disclosure of the head blow, the condition that was reported to emergency medical attendants at the hospital as the reason for Banks's admission was the seizures he had suffered at the precinct and on the way to the hospital.

The lack of information about Banks's head injuries caused misdiagnosis of his condition and significant delay in his obtaining proper treatment for his real ailment. During this delay he suffered severe brain swelling and aggravating damage from which he never recovered. From the time Banks fell to the pavement up to the moment he went into a coma in the hospital several hours later he was semi-conscious and appeared to be suffering pain, but unable to communicate coherently. Banks' medical experts testified that had the hospital staff known about and properly treated Banks's head injuries immediately upon his admission, it might have been possible to relieve his condition and perhaps prevent his death.

Having invoked his privilege under the Fifth Amendment of the United States Constitution not to incriminate himself, Yokemick declined to be deposed in connection with this action, and was precluded by the Court from offering any defense relating to any matter as to which he had refused to provide discovery.[2] For the

---

2. During pretrial proceedings it came to the Court's attention that the United States Attorney had undertaken a review of the circumstances surrounding Banks's death. By reason of that investigation, not only Yokemick but several other police officers who were among the original defendants in this case and whose involvement in the events in question also came within the scope of the Government's review, invoked their Fifth Amendment privilege and refused to offer any testimony at their depositions. The Court postponed further proceedings and delayed scheduling a trial for several months pending the outcome of that investigation. When it became apparent that a conclusion of the United States Attorney's criminal proceedings was not forthcoming, the Court scheduled the civil trial of this matter. The Court's ruling denying Yokemick's motion

same reason, a number of the other police officers on the scene who witnessed or had some role in the events at issue in this case declined to testify.[3] Yokemick's defense in this case thus was limited to cross-examination of Banks's witnesses and experts. As an alternative explanation for Banks's head injuries, he endeavored to elicit evidence to support his theory that Banks's injuries might have been consistent with his head striking the pavement during his arrest.

As the Court views the record, the jury was presented sufficient undisputed evidence from which rational persons could have drawn the inferences and reached the conclusions reflected in a verdict against Yokemick. On this basis the Court cannot conclude either that there was such a complete lack of evidence supporting the jury's determination that it could only have been the product of sheer surmise or conjecture, or that there was such an overwhelming amount of evidence in Yokemick's favor that reasonable and fair-minded persons could not have reached a verdict against Yokemick. *See Song*, 957 F.2d at 1046. Accordingly, Yokemick's challenge to the sufficiency of the evidence is rejected and his motion for judgment as a matter of law on this ground is denied.

## B. *LOSS OF LIFE*

Yokemick argues that a right of action for loss of enjoyment to life has not been recognized in New York under common law or under the state's wrongful death statute, nor by the Second Circuit under § 1983 jurisprudence.[4] He therefore maintains that such a claim cannot be pursued by Banks's estate.[5] According to this

---

for a further stay of the civil case is reported in *Banks v. Yokemick*, 144 F.Supp.2d 272, 274–76 (S.D.N.Y.2001).

**3.** Ms. Banks sought an instruction that would allow the jury to draw negative inferences against Yokemick from these officers' invocation of the Fifth Amendment and refusal to be deposed. The Court denied this request. *See id.* at 289–90.

**4.** Yokemick does not specifically address this issue in his post-trial brief, although in the memorandum's conclusion he requests vacatur of the $500,000 award on the ground that "plaintiff did not have a constitutional claim." Def. Memo at 17. At trial and post-trial conferences Yokemick also objected to the claim being submitted to the jury. The Court allowed the claim to go to the jury after noting Yokemick's objection and reserving decision on it on the understanding that the Court would rule on the objection as a matter of law in the event the jury found liability on this claim. On this basis, the Court accepted and considered a letter dated July 25, 2001 (hereinafter "Yokemick's July 2001 Letter") from Yokemick's counsel to the Court addressing this issue more specifically. The Court saw no prejudice to Banks in its consideration of Yokemick's July 2001 Letter because Yokemick had already expressed his legal objection to the claim on the record and because the document was submitted prior to the August 10, 2001 deadline for Banks's response to Yokemick's motion. In fact, Banks's response to Yokemick's motion makes specific mention of the July 2001 Letter. *See* Pl. Memo at 16.

**5.** To the extent Yokemick's motion papers briefly address the issues, they refer to and cite New York's wrongful death law, the Estates Powers and Trust Law (hereinafter the "EPTL") § 5–4.3, as the basis for his objection to Banks's loss of enjoyment of life claim. *See* Yokemick's July 2001 Letter, at 2. That statute authorizes award of damages in wrongful death actions in such sum as the fact finder "deems to be fair and just compensation for the pecuniary injuries resulting from the decedent's death to the persons for whose benefit the action is brought." EPTL § 5–4.3 (McKinney's 2001). The law has been applied to limit recovery to pecuniary damages only and to the degree they could be claimed by eligible beneficiaries for lost services. *See Johnson v. Manhattan & Bronx Surf. Trans. Oper. Auth.*, 71 N.Y.2d 198, 524 N.Y.S.2d 415, 519 N.E.2d 326, 328 (1988). Under these restrictions, recovery for the decedent's loss of enjoyment of life would not be recognized. *See Sand v. Chapin*, 238 A.D.2d

view, recovery under wrongful death or survival claims in New York is limited to the losses the survivors or the decedent's estate can establish having suffered as a consequence of the injured party's death, and such injuries do not encompass the dead person's loss of enjoyment of life. Finally, Yokemick argues that Ms. Banks produced no evidence at trial fairly quantifying the kinds or amounts of pecuniary damages Banks's estate suffered that would justly compensate for his death. The Court finds no basis in these arguments to support granting Yokemick's motion for judgment as a matter of law.

As a threshold matter, the Court must note the essential distinction between the rights and causes of action at issue. Banks's claim for loss of enjoyment of life

as a component of recovery under his § 1983 excessive force case is pressed as an individual action filed on behalf of his estate. It is asserted to recover for personal injuries that Banks, while still living, experienced as a consequence of the deprivation of his federal civil rights. This theory of recovery differs fundamentally from a claim based on compensation for any economic losses cognizable under state law that Banks's estate could assert or that his statutory beneficiaries may have experienced and that accrued upon Banks's death.

Nonetheless, § 1983 itself contains no provision defining specific elements of recoverable damages. Resolution of the applicable rule of decision here thus requires consideration of 42 U.S.C. § 1988.[6] *See*

---

862, 656 N.Y.S.2d 700, 701–02 (3d Dep't 1997).

> The State's wrongful death law may be inapposite here, however, insofar as Ms. Banks is pursuing the claim that went to the jury not on her own behalf as a designated wrongful death law beneficiary but as administratrix of Banks's estate. In that situation, the applicable law is the State's survivorship of claim statute, EPTL § 11–3.3 (McKinney's 2001). That provision states that
>
> > [w]here an injury causes the death of a person the damages recoverable for such injury are limited to those accruing before death and shall not include damages for or by reason of death. . . . The damages recovered become part of the estate of the deceased.
>
> This statute also has been construed to bar recovery for loss of enjoyment of life. *See Sand,* 656 N.Y.S.2d at 701; *Kordonsky v. Andrst,* 172 A.D.2d 497, 568 N.Y.S.2d 117, 119 (2d Dep't 1991).
>
> The two causes of action are distinct and designed to benefit different persons, although the underlying purpose of both is the same: to compensate for damages attributable to the death of a person injured by a wrongful act. *See generally* W. Prosser & P. Keeton, *Prosser & Keeton on Torts* § 127, at 947 (5th ed.1984); *see also Rosa v. Cantrell,* 705 F.2d 1208, 1222 (10th Cir.1982), *cert.*

denied, 464 U.S. 821, 104 S.Ct. 85, 78 L.Ed.2d 94 (1983) (noting that while "a survival claim is based on the decedent's claim for damages sustained during a lifetime[,]. . .a wrongful death action creates a new claim or cause of action for the loss sustained by a statutory beneficiary of the decedent (directly from his death.")). Given the brevity and ambiguity of Yokemick's July 2001 Letter, which cites cases addressing both EPTL § 5–4.3 and § 11–3.3, for the purpose of the discussion below, the Court will assume that Yokemick's challenge to the loss of life claim is properly grounded on EPTL § 11–3.3, although arguably the analysis may yield the same result even it involved the wrongful death law. *See Berry v. City of Muskogee,* 900 F.2d 1489, 1498 (10th Cir.1990); *Greene v. City of New York,* 675 F.Supp. 110, 114–15 (S.D.N.Y. 1987); 1C Martin A. Schwartz and John E. Kirklin, *Section 1983 Litigation* § 13.6, at 94–95 (3d ed.1997) (hereinafter *"Section 1983 Litigation"*).

**6.** Section 1988 provides in pertinent part that the federal courts' jurisdiction under § 1983:

> shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable

*Robertson v. Wegmann,* 436 U.S. 584, 588, 98 S.Ct. 1991, 56 L.Ed.2d 554 (1978) (instructing that if § 1983 does not clearly address or provide a solution for a particular issue, state law should supply the rule of decision insofar as consistent with federal law).

■ Application of § 1988 demands a three-part inquiry. *See Burnett v. Grattan,* 468 U.S. 42, 47–48, 104 S.Ct. 2924, 82 L.Ed.2d 36 (1984). The Court must first determine whether "suitable" federal law exists. If so, § 1983 must be applied in conformity with such law. *See id.* Second, where such federal laws are not adapted to the object, or are otherwise deficient, the Court must inquire whether the laws of the relevant state provide a rule governing the particular issue. *See id.* If applicable state law exists, the Court must examine that solution to assess whether it is in some respect inconsistent with the federal Constitution and laws. *See id.*

■ In assessing claims of inconsistency, the pertinent inquiry is whether the particular state law is generally inhospitable to § 1983 claims. *See Robertson,* 436 U.S. at 590, 98 S.Ct. 1991. In this connection, the Supreme Court has instructed that "[i]n resolving questions of inconsistency between state and federal law raised under § 1988, courts must look not only at particular federal statutes and constitutional provisions, but also at 'the policies expressed in [them]'." *Id.* at 590, 98 S.Ct. 1991 (quoting *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 240, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969); *see also Mason v. City of New York,* 949 F.Supp. 1068, 1077 (S.D.N.Y.1996) ("'If there is an inconsis-

tency, the State law must be rejected, and this court must fashion an appropriate remedy to carry out the congressional purposes behind the civil rights legislation.'") (quoting *Goad v. Macon County, Tennessee,* 730 F.Supp. 1425, 1426 (M.D.Tenn. 1989)). An inconsistency between a state rule and the purposes of § 1983 may be found if the law "fails to take into account ... policies that are analogous to the goals of the Civil Rights Act." *Burnett,* 468 U.S. at 48, 104 S.Ct. 2924.

■■ Finally, bearing contextually on the courts' § 1988 analysis is the guidance of *Moor v. County of Alameda,* 411 U.S. 693, 703–04, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973). There, the Supreme Court offered two observations that serve to underscore the overarching federal purpose of the inquiry. First, the Court noted that whatever the source of law ultimately applied in a particular case, the rule of decision adopted under § 1988 "'is a federal rule responsive to the need whenever a federal right is impaired.'" *Id.* at 703, 93 S.Ct. 1785 (quoting *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 240, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969)). The Court also declared that § 1988 was not intended "to authorize the wholesale importation into federal law of state causes of action ...." *Id.* Moreover, the Court instructed that when construing § 1988, "'both federal and state rules on damages may be utilized, *whichever better serves the policies expressed in the federal statutes*'." *Id.* (quoting *Sullivan,* 396 U.S. at 240, 90 S.Ct. 400 (emphasis added)).

■ In the case at bar, as discussed above, the primary aim embodied in the

remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction is [located], so far as the same is not inconsistent

with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause....

*Id.*

state's survivorship statute is compensatory.[7] The law is designed to provide financial remedy to the decedent's estate and its beneficiaries, and, to the extent possible, to make them whole for the damages they may have suffered by reason of the decedent's death.

 In contrast, in construing the basic purpose of the award of damages under § 1983, the Supreme Court has noted that it is "to protect persons from injuries to *particular interests,* and their contours are shaped by the interest they protect." *Carey v. Piphus*, 435 U.S. 247, 254, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) (emphasis added). As further elaborated, the statute's central aim may be viewed as a double-edged sword whose dual aspect is designed to protect and deter, to benefit the victim while penalizing the offender. *See Monroe v. Pape*, 365 U.S. 167, 184, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). On the one hand, the Civil Rights Act safeguards the rights of individuals wronged by the " '[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.' ". *Id.* (quoting *United States v. Classic*, 313 U.S. 299 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941)). At the same time, the law enforces the Fourteenth Amendment against government officials "who carry the badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or abuse it." *Id.* at 172, 81 S.Ct. 473. Moreover, the Court instructed that: "The purpose of § 1983 would be defeated if injuries caused by the deprivation of constitutional rights went uncompensated simply because the common law does not recognize an analogous cause of action." *Id.* at 258, 81 S.Ct. 473.

Here, the particular interest asserted and the fundamental constitutional right sought to be vindicated is Banks's Fourth Amendment right not to be subjected to use of excessive force by police that caused his loss of life. The right to enjoyment of life without its unlawful curtailment has an intrinsic worth that necessarily exceeds the dollars-and-cents value of the decedent to his beneficiaries. For, implicit in the legislative history and philosophy of § 1983 is that the life interest the statute protects is not just the private economic interest of the injured person himself to enjoy his own life, but the much more fundamental public interest of the rest of society in that the life of any individual not be ended by the lawless conduct of state agents. To this extent, in a measure of damages under the federal statutory scheme, a state rule's quantification of the value of a particular person's life would be fundamentally flawed insofar as it counted alike whether the individual died of natural causes or was killed unlawfully by the state's own hand. The life wrongfully foreshortened is doubly shortchanged if that singular quantum of loss is discounted in the official reckoning of the persons's social worth.

 On its face and as construed by New York courts, the state's survival claim law does not evince an objective to secure compensation designed to protect these broader non-economic interests that inure to the benefit of both the decedent and the larger community. *See* EPTL § 11–3.3; *see also Sand,* 656 N.Y.S.2d at 701; *Kordonsky,* 568 N.Y.S.2d at 119. In other words, the interests the state law seeks to promote are principally the financial needs the decedent's estate and its intended beneficiaries. These values do not encompass the whole expanse of intangible, more so-

---

**7.** *See supra* note 5.

cial and individual interests, such as enjoyment of life, that inherently derive from the person of the victim and that § 1983 protects from unlawful deprivation.

Consonant with this principle, the Supreme Court in *Robertson* found no inconsistency between Louisiana's survivorship law and § 1983 under circumstances where the injured party had died during the litigation of causes unrelated to the misconduct at issue in the case and the compensation involved would have benefitted primarily the executor of the decedent's estate, rather than interests more individually associated with the injured party. That under the state statute the underlying cause of action abated upon plaintiff's death, the Court noted, would not affect § 1983's purpose of preventing official misconduct on the facts presented, at least under circumstances in which the underlying claim did not entail misconduct that caused the plaintiff's death. *See id.* at 592, 594, 98 S.Ct. 1991 ("We intimate no view . . . about whether abatement based on state law could be allowed in a situation in which deprivation of federal rights caused death.").

 The question the Supreme Court left open in *Robertson,* and that is raised by the facts in the case at hand, has been answered in several cases in which the issue has arisen. Uniformly, the courts have ruled that when a violation of federal rights protected by § 1983 does cause the decedent's death, state laws that either extinguish the survival action or bar recovery for loss of life, effectively abate a § 1983 claim of deprivation of life, are inconsistent with § 1983, and warrant application of a federal rule of decision pursuant to § 1988. *See Berry,* 900 F.2d at 1501 ("We are satisfied that Congress intended significant recompense when a constitutional violation caused the death of a victim. The general legislative history of the 1871 act makes clear that death was among the civil rights violations that Congress intended to remedy."); *Bass v. Wallenstein,* 769 F.2d 1173, 1189–90 (7th Cir. 1985) (holding that where the constitutional violation has caused death, "state law that precludes recovery on behalf of the victim's estate for loss of life is inconsistent with the deterrent policy of section 1983.") (citing *Bell v. City of Milwaukee,* 746 F.2d 1205, 1234 (7th Cir.1984)); *Jaco v. Bloechle,* 739 F.2d 239 (6th Cir.1984); *McFadden v. Sanchez,* 710 F.2d 907, 911 (2d Cir.1983).

In *McFadden,* for example, the Second Circuit held in an analogous situation that while under state law punitive damages are not recoverable by the designated beneficiaries in a wrongful death action, they may be awarded as a matter of federal law under § 1983. *See McFadden,* 710 F.2d at 911. In so ruling the Circuit Court stated: "To whatever extent section 1988 makes state law applicable to section 1983 actions, it does not require deference to a survival statute that would bar or limit the remedies available under section 1983 for unconstitutional conduct that causes death." *Id.; see also Section 1983 Litigation* § 13.2, at 78 ("The dominant theme of these decisions is that a federal rule of survivorship is necessary to carry out the policy of deterring constitutional violations by state and local officials that result in death.").

These cases also confirm a reading of § 1983 that the statute is founded on principles fostering policy ends and protecting interests broader than merely making the decedent's estate economically whole. Manifest in the courts' consideration of the issues is that life is perhaps the most profoundly personal and vital of civil rights. Its unlawful deprivation by public officials, or under the color law, goes to the very core of the rule of law. *See e.g.,*

*Graham v. Sauk Prairie Police Comm'n,* 915 F.2d 1085, 1105 (7th Cir.1990) (noting that the legislative history underlying § 1983 "expresses an unequivocal concern for *protecting life* ") (emphasis in original); *see also Berry,* 900 F.2d at 1506–07; *Jaco,* 739 F.2d at 244.

To these ends, § 1983 effectuates a remedy that permits the assertion and vindication of the injured person's federal civil rights, thereby achieving a dual purpose of not only compensating victims for suffered wrongs, but also deterring future deprivations of constitutional rights through compensatory and, where appropriate, punitive damages. *See Robertson,* 436 U.S. at 590–91, 98 S.Ct. 1991; *Carey,* 435 U.S. at 254–57, 98 S.Ct. 1042.

The case law affirms the obvious. A result that would recognize damages for infliction of severe pain and suffering short of death but extinguish the cause of action at the moment the victim expires is inherently illogical and incompatible with the deterrent purposes of § 1983. In essence, it would import into § 1983 a peculiar form of economics with a uniquely macabre cost-benefit analysis. In an odd way, this calculus would discourage half-measures, enabling violators of life to draw a bounty from the saving grace of death. A defendant would be rendered liable to the injured person who suffers a punch or a slap, but not for the victim's instant death; a mere maming would be fully recompensed, but not a slaying. Thus, the rule would tell offenders that, having already dealt grievous blows, it pays to dispatch the victim with a self-serving act of homicide in order to realize economies on their potential civil liability.

Such a consequence is especially pernicious in the context of law enforcement agents. In appropriate circumstances these public officers are licensed to kill and are equipped with the means to do so.

Moreover, in the course of performing their public duties, they frequently encounter situations that require the use of force and demand considered judgment calls, ordinarily to be made on-the-spot, of how much force the circumstances warrant. Consequently, whether to kill or not to kill is a question police officers must routinely confront, not only as official function or moral or existential quandary, but also as naked opportunity vested with the color of law. And when they do take life illegally in the name of the state, the offense does more than extinguish a soul and deprive one person of civil rights; it assaults and corrupts the foundation of the rule of law. By training, law enforcement agents also know the bounds of permissible official conduct and have familiarity with the scope and nuances of liability for departures from established rules. In the federal scheme codified by § 1983, the civil rights laws' response to these realities demands application of a rule of decision more finely calibrated than a compensatory purpose that, without distinction as to grades of offenses or types of offenders, confines its recognition of remediable interests predominantly to the economic losses of the victim's estate.

These incongruities have been noted by other courts, prompting them to hold that application of a state law that would achieve such anomalous outcomes in a context of § 1983 claims would conflict with the policy ends of the federal statute. *See Bass,* 769 F.2d at 1190 (sustaining a claim for damages arising from loss of life, the court declared that "state law that precludes recovery on behalf of the victim's estate for the loss of life is inconsistent with the deterrent policy of Section 1983"); *Bell,* 746 F.2d at 1239 ("[I]f Section 1983 did not allow recovery for loss of life notwithstanding inhospitable state law, deterrence would be further subverted since it

would be more advantageous to the unlawful actor to kill rather than to injure."); *Jaco*, 739 F.2d at 244 ("to suggest that Congress had intended a civil rights infringement be cognizable only when the victim encounters pain and suffering before his demise, is absurd."); *Roman v. City of Richmond*, 570 F.Supp. 1554, 1556–57 (N.D.Cal.1983) ("where a defendant is required to bear a greater economic loss where he injures a person by use of excessive force than when he kills the person, the result is a tacit authorization that the actor should inflict excessive force to the point of death. . . . Thus, courts must fashion a remedy to prevent this result; an award of damages to deter such an unconstitutional use of force is appropriate.").

Based on the reasoning and precedent of these authorities, the Court finds that insofar as New York's survivorship of claims statute would bar recovery of the damages that the jury awarded for Banks's loss of enjoyment of life, the state law fails to take into account policies analogous to the goals expressed in § 1983. *See Burnett*, 468 U.S. at 48, 104 S.Ct. 2924. Weighing the state statute against federal rules fashioned by courts in assessing comparable § 1983 claims, this Court is persuaded that the federal rules better serve the policies expressed in § 1983. *See Robertson*, 436 U.S. at 590, 98 S.Ct. 1991; *Moor*, 411 U.S. at 703, 93 S.Ct. 1785. On this basis, the Court concludes that § 1988 does not compel application of state law in the instant case. *See Burnett*, 468 U.S. at 47–48, 104 S.Ct. 2924. Accordingly, the Court denies Yokemick's motion for judgment as a matter of law in this regard and sustains the jury's corresponding verdict awarding Banks damages for loss of enjoyment of life.

## C. *PAIN AND SUFFERING*

■ Yokemick's objections to the jury's verdict on Banks's state law claim also lacks merit. He argues that the pain and suffering award duplicates the damages the jury compensated in connection with Banks's federal claim and that the amount was excessive in that other police officers began arriving at the scene shortly after Banks's injury. On Yokemick's theory, his responsibility for any pain and suffering Banks may have felt did not extend beyond the few minutes before other assistance appeared.

The jury was instructed that if different injuries were attributed to different claims, it must compensate separately for all injuries it found had been established.[8] It was also advised that in connection with the State claim of negligent procurement of adequate medical treatment Banks claimed having experienced conscious pain and suffering over a different period and of longer duration than that attributable to his federal claim based on excessive use of force. Banks's two claims are therefore grounded on separate legal theories, and assert injuries which, though similar, stem from different causes and span different times.

The pain and suffering associated with Banks's federal excessive use of force claim related primarily to the injury resulting from the impact of the blow to the head Banks experienced from Yokemick's radio and lasted some amount of time

---

**8.** On this point, the jury was specifically instructed that:

[I]f different injuries are attributed to the separate claims, then you must compensate fully for all injuries Ms. Banks established Kenneth Banks suffered. You may bear in mind, however, that Ms. Banks asserts that

Kenneth Banks suffered conscious pain and suffering in connection with the negligent procurement of adequate medical treatment that was of longer duration than that attributable to the alleged excessive use of force. *See* Trial Transcript ("Tr.") at 798–99.

thereafter. On the other hand, the pain and suffering award corresponding to the state claim was linked to the injury inflicted during the much longer period Banks, while still conscious, lay unattended on the ground, and the time he spent in the jail cell and on the way to and in the hospital. To a large extent, this aspect of pain and suffering could be reasonably separated from the blow to Banks's head by Yokemick's radio, and at some causal point, the aggravation and duration may be more properly attributed instead to Yokemick's failure to disclose Banks's head injury, thereby unreasonably delaying Banks's obtaining appropriate medical treatment that may have relieved his condition sooner.

Thus, while the allocation is necessarily imprecise and conceivably may encompass some overlap at the edges, based on the factual record and the Court's instructions, the jury reasonably could have concluded that Banks suffered different forms or degrees of injuries at different times separately compensable. That the jury awarded $25,000 as to the excessive force claim and $75,000 as to the unreasonable delay in obtaining medical attention supports a fair inference that the verdict is consistent with this explanation and reflects adherence to the Court's instructions. The Court is persuaded that there was a sufficient evidentiary basis upon which a rational jury could support these distinct awards and thus denies Yokemick's motion insofar as it rests on this ground.

## D. *DUTY OF CARE*

█ The Court finds no legal ground for Yokemick's argument that the verdict as to the unreasonable delay in medical treatment claim should be set aside because Banks produced no witnesses or other evidence at trial to establish that Yokemick had an affirmative duty to obtain medical attention for Banks. Whether or not a particular legal duty exists is a matter of law established by the court, not one that requires the submission of evidence for the jury to determine. *See Alfaro v. Wal–Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir.2000) ("The question of the existence and scope of an alleged tortfeasor's duty 'is in the first instance, a legal issue for the court to resolve.' "); (quoting *Waters v. New York City Housing Auth.*, 69 N.Y.2d 225, 513 N.Y.S.2d 356, 505 N.E.2d 922 (1987)); *see also Palka v. Servicemaster Mgmt. Servs. Corp.*, 83 N.Y.2d 579, 611 N.Y.S.2d 817, 634 N.E.2d 189, 192 (1994) (the definition and scope of a tortfeasor's duty "is usually a legal, policy-laden declaration reserved for judges to make prior to submitting anything to fact-finding or jury determination."); Prosser & Keeton, *supra*, § 37 at 236. Thus, the jury's only office here was to apply the facts presented at trial to determine whether, under the circumstances, Yokemick exercised ordinary care in handling Banks's need for medical attention.

█ In this case, the Court permitted Banks's cause of action based on allegations of inadequate provision of medical attention to go to the jury on the basis of the Court's determination, as a matter of law, that a legal duty to procure adequate medical attention existed under the pertinent circumstances of this case. *See Dunham v. Village of Canisteo*, 303 N.Y. 498, 104 N.E.2d 872, 875 (1952) ("the village authorities, having assumed charge of the deceased when he was incoherent and unable to represent himself, were under an obligation to exercise ordinary care.... The care.... required includes the procurement of medical assistant, if the village knew or should have known that the deceased was hurt or injured and in need of a doctor."); *Endy v. Village of Nyack*, 576 F.Supp. 1562, 1564 (S.D.N.Y. 1984). On the record before it, a reason-

able jury could have concluded that Yokemick failed to exercise the degree of care necessary under the circumstances to avert further injury to Banks. Thus, the Court rejects Yokemick's request for relief on this basis.

### E. *WRONGFUL DEATH*

 With regard to Ms. Banks's state law wrongful death cause of action, the claim was limited to $5,000 to cover Banks's funeral expenses. The jury awarded that amount. At trial, Ms. Banks testified that amount represented the extent of the costs Banks's estate had incurred on his funeral. This evidence was uncontroverted. The jury, in assessing Ms. Banks's testimony, was entitled to weigh her credibility and credit the evidence or not as it deemed appropriate. The Court finds that the verdict was rationally supported by a sufficient evidentiary record.

Accordingly, the Court denies Yokemick's motion for judgment as a matter of law as it relates to the jury's award on Ms. Banks's wrongful death claim.

### II. *SETOFF*

### A. *RULE OF DECISION*

Yokemick argues that New York G.O.L. § 15–108 [9] applies to this case and entitles him to set off the total damages of $605,000 for which the jury held him liable against the $750,000 settlement Ms. Banks had reached with the City and all the other defendants. Asserting that in this case there was only one set of operative facts

and that thus there can be only one recovery, Yokemick contends that G.O.L. § 15–108 entitles him to such a full reduction of his liability.

Banks argues that (1) the setoff rule applicable to this case derives from federal common law, not from G.O.L. § 15–108, and that federal principles in the context of a § 1983 claim would not recognize the full credit Yokemick urges; and (2) G.O.L. § 15–108 would not apply to this case in any event both because it is inconsistent with the underlying federal policies of § 1983 and because the terms of Ms. Banks's settlement with the other defendants take the case outside the language of G.O.L. § 15–108. Finally, Banks maintains that Yokemick waived his setoff defense by not asserting it in his answer, amended answer or pretrial order and by not presenting any evidence at trial supporting setoff of the jury's award on the basis of an equitable share of responsibility of other defendants for Banks's injuries. The Court agrees that under any of these grounds Yokemick is not entitled to the setoff he claims.

There is no mention of setoff in § 1983. *See* 42 U.S.C. § 1983; *Miller v. Apartments and Homes of New Jersey, Inc.*, 646 F.2d 101 (3d Cir.1981); *Mason v. City of New York*, 949 F.Supp. 1068, 1077 (S.D.N.Y.1996). Absent § 1983's specific reference to setoff, courts which have considered the issue have followed two approaches towards resolving the applicable rule of decision. The first, adopted by the Third Circuit in *Miller*, relies on the au-

---

9. GOL § 15–108 provides:
 When a release or a covenant not to sue or not to enforce a judgment is given to one of two or more persons liable or claimed to be liable in tort for the same injury, or the same wrongful death, it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms expressly so provide, but it reduces

the claim of the releasor against the other tortfeasors to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, or in the amount of the released tortfeasor's equitable share of the damages under article fourteen of the civil practice law and rules, whichever is the greatest.

thority of federal courts to resolve "interstitial" questions that Congress has left open in federal statutory schemes. *See Miller*, 646 F.2d at 107–08. Under this method, the determination of whether a particular gap is to be filled with federal common law or state law depends upon an inquiry that considers Congressional purpose; the underlying goals of a statute; the extent to which those ends would be promoted by application of federal law or impeded by state law; and the traditional allocation of functions between state and federal law. *See id.*

The second course is that adopted by the Fifth Circuit panel in *Dobson v. Camden*, 705 F.2d 759, 763 (5th Cir.1983) ("*Dobson I* "), *rev'd on other grounds*, 725 F.2d 1003 (5th Cir.1984) ("*Dobson II* "). Pursuant to that approach, if a court finds that federal law is deficient with regards to a particular matter at issue, the court, applying the guidance provided in § 1988, must then examine state law governing the issue to determine whether or not it is consistent with federal law. *See Dobson I,* 705 F.2d at 763 (noting that if the Third Circuit's reasoning on *Miller* were correct "section 1988 would make no sense...on that point."); *see also Johnson v. Rogers,* 621 F.2d 300 (8th Cir.1980); *Goad,* 730 F.Supp. at 1430. This Court finds the reasoning and approach of *Dobson I* more compelling in the context of a § 1983 claim, and is persuaded that the more appropriate course for it here would be to turn for guidance to the provisions of § 42 U.S.C. § 1988.

Three principal considerations weigh in this conclusion. First, *Miller* did not implicate § 1983. The case involved racial discrimination by private persons in a real estate transaction in violation of § 1982 and the federal Fair Housing Act. *See Miller,* 646 F.2d at 110. The Third Circuit's analysis therefore did not have occa-

sion to address a particular dimension unique to § 1983 claims: wrongdoing by state officials and the aspects of the Civil Rights Act's history and purposes uniquely related to that factor. Accordingly, the *Miller* court's assessment of a suitable rule of decision to resolve the situation before it is confined to equitable considerations of preventing unjust enrichment and ensuring equality of liability among defendants, as well as encouraging settlements. *See id.* at 109–10. The analysis makes no mention whatever of the vital deterrent purpose that underpins § 1983.

Second, insofar as § 1983 by its very nature involves constitutional violations asserted against state government agents, there may be a warranted interest in giving particular consideration to the degree to which those officials may have a reasonable interest in and expectations to the application of state statutes that facially may entitle them to claim the protections and benefits of such laws. Where the federal courts find the state laws invoked to be inapplicable or inconsistent with federal policies, the basis for that determination takes on an added dimension that bears exacting consideration and reasoned explanation under the circumstances.

Third, in § 1983 cases, circumstances may arise, as occurred in *Dobson I,* where in fact the violations at issue may involve actions, such as conspiracy, that may encompass the conduct of both public and private wrongdoers acting under the color of law or may be grounded on state and federal claims that rest on common elements. *See, e.g., Mason,* 949 F.Supp. at 1070–71. Such cases may introduce unique permutations into the § 1983 rule of decision inquiry that may affect its results—for example, the application of qualified immunity doctrines available to government agents only. Specific state rules may bear on the equities in the apportion-

ment of liability and require a more searching review of state law in an assessment of inconsistency with federal policies. Conceivably, as in *Johnson*, 621 F.2d 300, *Goad*, 730 F.Supp. 1425, and *Mason*, *supra*, among the possible combinations of events, one or more applications of state law may be found consistent with both §§ 1983 and 1988. Such alternatives would be prematurely foreclosed if the courts' analysis under §§ 1983 and 1988 by-passed review of state law altogether and moved directly into fashioning a federal common law solution.

In examining the applicability of § 1988 to setoff claims in the context of § 1983 claims, a number of courts have found that "federal law is deficient on the effect of a plaintiff's settlement with a joint tortfeasor on a judgment against a nonsettling tortfeasor." *Dobson I*, 705 F.2d at 763; *Johnson*, 621 F.2d at 304 n. 6; *Hoffman v. McNamara*, 688 F.Supp. 830, 832–33 (D.Conn.1988); *but cf. Miller*, 646 F.2d at 110. The analysis in these cases concerning the suitability of federal law to resolve setoff issues, however, predates the Supreme Court's ruling in *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 114 S.Ct. 1461, 128 L.Ed.2d 148 (1994).

The "laws of the United States" include federal common law. *See Mason*, 949 F.Supp. at 1077, (citing *Gray v. City of Kansas City, Kan.*, 603 F.Supp. 872, 875 (D.Kan.1985)). Thus, the Court must address whether, as Banks contends, *McDermott* definitively resolved the question of setoff in § 1983 cases as a matter of federal common law, obviating the need in this case to resort to state law. This Court, though acknowledging, as discussed below, that the federal common law landscape has been significantly altered by *McDermott*, nonetheless concludes that the question of the appropriate rule of decision for setoff in § 1983 cases has not been dispositively settled as a matter of federal common law.

In *McDermott*, an admiralty case, the Court considered at length the appropriateness as a federal common law rule of decision three alternatives to resolve the situation of when a nonsettling joint tortfeasor is held liable at trial and then asserts that he is entitled to credit the plaintiff's settlement with other defendants to satisfy all or portions of the verdict. *See McDermott*, 511 U.S. at 208–09, 114 S.Ct. 1461. The first two approaches entail versions of a *pro tanto* rule under which a settlement is applied dollar-for-dollar to the plaintiff's claim against the nonsettling party, reducing that defendant's subsequent liability by the full extent of the settlement. *See id.* The third method, referred to as the proportionate share rule, allows a credit against the injured party's recovery from the nonsettlor by the equitable share of the released tortfeasors' comparative fault. *Id.*

The Supreme Court weighed the relative merits of the three options against three considerations: consistency with the rule of proportionate fault adopted in *United States v. Reliable Transfer*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975); promotion of settlement; and judicial economy. *See McDermott*, 511 U.S. at 211, 114 S.Ct. 1461. On this analysis, the Court concluded that the proportionate share method provided the correct rule to apply in the circumstances before it. *See id.* at 204, 211, 114 S.Ct. 1461.

Banks quotes a leading treatise on § 1983 for the proposition that *McDermott* now "provide[s] a federal law solution to the settlement issue setoff issue, making it unnecessary to resort to state law," under § 1988. *Section 1983 Litigation*, *supra*, § 16.22 at 323–24. Applying the *McDermott* rule, Banks contends that Yokemick is not entitled to set off any portion of the

jury's award against Banks's settlement because he did not establish at trial that any other party shared responsibility for Banks's injuries.

In turn, Yokemick challenges the applicability of *McDermott* on the grounds that the case arose in the context of a maritime dispute and that the Supreme Court's opinion expressly mentions that its ruling pertains to an admiralty case.

Yokemick's attempt to circumscribe the relevance of *McDermott* is unpersuasive. Insofar as *McDermott* articulates a rule of law governing maritime cases, it now constitutes an aspect of the "laws of the United States." To this extent, it represents a principle to which a district court can turn for guidance and precedent absent a squarely controlling state law, or confronted with a relevant state statute that ostensibly may apply but that, on closer scrutiny, in some material respect may be fundamentally inconsistent with federal law. *See Robertson,* 436 U.S. at 588–90, 98 S.Ct. 1991; *Goad,* 730 F.Supp. at 1426.

Moreover, while *McDermott* arose as an admiralty case, the central question the Supreme Court addressed did not involve uncommon issues or arcane concepts grounded on matters unique to maritime actions. Rather, the actual dispute entailed general principles of common law tort. In fact, as the Court acknowledged, the three setoff methods it considered derived from the American Law Institute's Restatement (Second) of Torts § 886 A, and corresponded to three Model Acts proposed by the National Conference of Commissioners on Uniform State Laws on the subjects of uniform contribution among tortfeasors and comparative fault. *See McDermott,* 511 U.S. at 208–09, 114 S.Ct. 1461. Thus, as a now prominent bough in the branching of federal common law directly·bearing on the issue before this Court, *McDermott* cannot be ignored or

lightly dismissed. Instead, it must be considered as a significant reference point, if not the touchstone for whatever guidance it offers in informing this Court's inquiry concerning the applicable rule governing setoff and in fashioning a remedy in a § 1983 case.

Confirming the evolutionary growth of common law, the implications of *McDermott* are already manifest as tendrils sprouting in other areas of federal law. Most notable is the Second Circuit's reference to *McDermott* in *Bragger v. Trinity Capital Enterp. Corp.,* 30 F.3d 14 (2d Cir. 1994). In the securities fraud dispute there at issue, the Circuit Court, while sustaining dismissal of the underlying action as moot, reversed the portion of the district court's ruling that required any judgment against defendant to be reduced on a *pro tanto* basis. The court observed that:

> [w]e think it imprudent in light of a recent unanimous decision of the Supreme Court holding, after thorough analysis of the *pro tanto* and proportional judgment reduction methods, that at least in admirably suits for damages, the proportional reduction approach is best.

*Id.* at 17. (citing *McDermott,* 511 U.S. 202, 114 S.Ct. 1461).

While Yokemick dismisses this language as dictum, this Court reads the Second Circuit's ruling as offering germane instruction that intimates the Circuit Court's view of *McDermott* and helpfully guides this Court's judgment on the matter at hand. That the Circuit Court, while acknowledging that the *McDermott* rule derived from an admiralty case, nonetheless cited its authority in reversing a judgment in a securities action is instructive of a course permissible for this Court to pursue in the instant case. In fact, other courts, similarly avowing the relevance of *McDermott,* have recognized or extended beyond

maritime actions the applicability of the proportionate share approach as a federal common law rule of decision. *See, e.g., Eichenholtz v. Brennan,* 52 F.3d 478, 487 n. 16 (3d Cir.1995) (securities case); *Gravatt v. City of New York,* 73 F.Supp.2d 438, 440–41 (S.D.N.Y.1999), *rev'd on other grounds,* 226 F.3d 108 (2d Cir.2000) (claim under state Labor Law and federal Longshore and Harbor Workers' Compensation Act); *Cortec Indus., Inc. v. Sum Holding L.P.,* No. 90 Civ. 0165, 1994 WL 722708, at *1 (S.D.N.Y. Dec. 30, 1994) (securities case); *In re Kendall Square Research Corp. Sec. Litig.,* 869 F.Supp. 53, 54–55 (D.Mass.1994) (same); *but cf. In re Crazy Eddie Sec. Litig.,* 948 F.Supp. 1154 (E.D.N.Y.1996).

However, because the cases cited above arose in connection with federal statutory schemes that do not contain the affirmative mandate expressed in § 1988, obligating the courts to look to pertinent state law in resolving certain open issues in § 1983 cases, the precedents do not squarely consider the proportionate share doctrine in a context precisely on point to the issue here. Consequently, this Court, absent more definite guidance from the Supreme Court or the Second Circuit, regards this authority as insufficient to support a ruling that the setoff issues in the case at bar may be decided by reliance on federal common law in the first instance, obviating resort to application of § 1988.

In this regard, however, the Fifth Circuit did consider the precise § 1983 setoff issue in *Dobson I,* a pre-*McDermott* case cited at length by the parties here.[10] There, Dobson was injured in a beating by police officers during an arrest or subsequent incarceration following events that occurred at a Denny's restaurant. Dobson, alleging use of excessive force, filed suit under § 1983 against the municipality and the officers involved. Denny's was also named in claims charging that Denny's had conspired with the officers to violate Dobson's constitutional rights.

Prior to trial, Denny's settled with Dobson for $30,000 and the case proceeded against the remaining defendants. The jury found only Camden, one of the police officers, liable on the excessive use of force claim and awarded Dobson $25,000, which the court later reduced to $21,135.96. Camden moved for a dollar-for-dollar credit on the verdict based on Dobson's settlement with Denny's. The trial court ruled that such a *pro tanto* reduction would violate the policies of § 1983. *Dobson I,* 705 F.2d at 761. Instead, the court applied a pro rata allocation that divided the various defendants into four groups according to plaintiff's theory of liability. *See id.* Because Denny's comprised one group by itself and had settled, the jury award was reduced by twenty-five percent, leaving $15,851.97 remaining on the verdict to be paid by Camden. On appeal, Camden argued that he was entitled under Texas law to full reduction of the judgment against him, leaving him no obligation to pay Dobson.

The Circuit Court panel, noting that "federal law is deficient on the effect of a settlement with a joint tortfeasor on the liability of a nonsettling tortfeasor" proceeded to examine § 1983's statutory ends.

---

**10.** The *Dobson I* panel's ruling was reversed by the *en banc* court on the ground that the injuries involved in the settlement and those that went to trial were different, and thus there was no basis for application of setoff at all or need to consider the § 1983 issue. In subsequent cases, the Fifth Circuit has followed reasoning consistent with the approach, if not the result of *Dobson I. See, e.g., Hinshaw v. Doffer,* 785 F.2d 1260 (5th Cir. 1986). But, whatever the precedential value that may be accorded to *Dobson I,* its analysis is comprehensive and its rationale certainly pertinent to the action before this Court.

*Id.* at 763. It found that deterrence was a central objective not reflected in the Texas setoff law at issue. That statute applied a "one satisfaction" rule which would have resulted in a *pro tanto* credit for a settlement, and which was "designed to ensure compensation and nothing more." *Id.* at 766. Under the state statutory scheme, applying Dobson's $21,135.96 verdict against his $30,000 settlement with Denny's, Dobson would be deemed fully compensated and not entitled to collect anything more from Camden.

The Fifth Circuit panel concluded that the Texas *pro tanto* setoff method was not consistent with federal law in that it did not effectuate the deterrence function of § 1983 and was thus impermissible as a rule of decision under § 1988. In framing a remedy, the court settled upon a proportionate share rule that presaged and paralleled the same concepts and analysis later articulated by the Supreme Court in *McDermott.* In so holding, the court stated that:

> [a] rule that removes the burden of damages from the wrongdoer certainly conflicts with the policy of deterrence. We must always be conscious that one of the functions of section 1983, if not the primary function, is therapeutic, seeking to eradicate the disease of violations of federal rights under color of state law. The one satisfaction rule, as this case well demonstrates, would tend to eliminate this constitutional medication.

*Id.* at 766.

The Court panel recognized that "deterrence is concerned with establishing a rule to shape future conduct" and that for it to function properly, each tortfeasor must pay for the proportional share of damage caused. Whether this payment results in "over, under, or exact compensation is beside the point." *Id.* at 770. Addressing the shortcomings of the compensation policy upon which the state's *pro tanto* law was grounded, the court found the deficiency in that:

> [a] potential tortfeasor's actions will probably not be shaped by consideration of whether the injured party will be compensated nearly as much as they will be shaped by consideration of whether the tortfeasor will have to pay. Accordingly, the issue of whether another joint tortfeasor has settled with the plaintiff just is not relevant at all to the deterrence rationale for requiring each nonsettling tortfeasor to pay a proportional share of damages.

*Id.* Accordingly, the panel concluded that a settlement by one tortfeasors has no effect on the liability of a nonsettling tortfeasor. *Id.* at 771.

An assessment of G.O.L. § 15–108 through the analytic framework and principles the *Dobson I* court employed would yield the same result here. Such an analysis shows that in contrast with the *pro tanto* credit that state law would recognize in this case, the proportionate share federal rule, fashioned by *Dobson* and now further reinforced by *McDermott,* "better serves the policies expressed in the federal statutes." *Moor,* 411 U.S. at 703, 93 S.Ct. 1785.

G.O.L. § 15–108, is a statute of general application. It governs all tort causes of action. It does not distinguish the public offender from the private, nor does it elevate a constitutional claim above a claim founded solely on common law. A close examination of its design reveals a policy scheme grounded primarily on two distinct sets of considerations: judicial economy and equitable and financial concerns. *See Apple v. Jewish Hosp. and Med. Center,* 829 F.2d 326, 331 (2d Cir.1987) (noting that § 15–108 "has two purposes: first, to encourage settlement...and, second, to ensure that nonsettling tortfeasors are not

required to bear more than their equitable share of liability.") (citing *Rock v. Reed–Prentice Division of Package Machinery Co.*, 39 N.Y.2d 34, 382 N.Y.S.2d 720, 346 N.E.2d 520 (1976) and *Mielcarek v. Knights*, 50 A.D.2d 122, 375 N.Y.S.2d 922 (4th Dep't 1975)).

At its most basic level, the driving force embodied in G.O.L. § 15–108 is that of ensuring the compensation of victims while preventing their unjust enrichment. Viewed as the reverse side of the same coin, to encourage settlements, the statute seeks a fair allocation of the total financial obligation for damages among all the tortfeasors found responsible for the particular party's injury, whether by settlement or trial. Significantly, the law in fact offers a choice based on the greater of a *pro tanto* credit or the released tortfeasor's proportionate share of the damages, *whichever favors the nonsettling defendant. See* G.O.L. § 15–108; *Roma v. Buffalo Gen. Hosp.*, 103 A.D.2d 606, 481 N.Y.S.2d 811, 812 (3d Dep't 1984). In this manner, the statute, in the interest of minimizing the potential for over-compensation, fosters equitable, financial and judicial economy policies that appear to convey more solicitude towards fairness to the nonsettling tortfeasor than to the injured party.

By contrast, § 1983's dominant focus is more expansive. As discussed above in the context of Banks's loss of life claim, the statute protects a wider breadth of both private rights and public interests accruing to the victim and the larger society. Insofar as § 1983 seeks to calibrate a balance of values, it appears to favor fairness first for the interests of the injured party, rather than promoting an economic equilibrium that tips the benefit of the doubt and resulting equities toward the wrongdoer. In this respect, the point of departure that the § 1983 inquiry compels is not what constitutes fairness from the economic perspective of a particular defendant but from what is equitable under the circumstances for the injured party in order to vindicate his civil rights and deter and/or punish the offender to avert future constitutional deprivations.

This expression of priorities is reflected in the legislative history of § 1983, which demonstrates that the law was enacted to " '[create] a species of tort liability' in favor of persons who are deprived of 'rights, privileges, or immunities secured' to them by the constitution." *Carey*, 435 U.S. at 253, 98 S.Ct. 1042 (quoting *Imbler v. Pachtman*, 424 U.S. 409, 417, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)). Thus, § 1983 addresses constitutional principles that reach profoundly to the core of our notion of justice and underpin our legal system's groundings on the rule of law. To these ends, the statute targets official misconduct only. By placing such offenses on a higher plane, elevating their gravity to the scale of constitutional deprivations, Congress gave expression to a matter reflecting unique public policy priority and value. In essence, it recognized that permitting inherent contradiction to exist in enforcing the governing principles upon which our nation is grounded corrodes and imperils our social values and justice system. In this regard, there is perhaps no more profound contradiction, or more fundamentally harmful personal injury, than when deprivations of civil rights are inflicted by the state itself: when constitutional offenses are committed, through actions directly authorized or taken under the color of law, by the very government agents whose public duties encompass protecting individual rights, promoting social values and promulgating fair and just behavioral norms. *See Owen v. City of Independence*, 445 U.S. 622, 651, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980) ("How 'uniquely amiss' it would be, therefore, if government it-

self—'the social organ to which all in our society look for the promotion of liberty, justice, fair and equal treatment and the setting of worthy norms and goals for social conduct'—were permitted to disavow liability for the injury it has begotten.") (quoting *Adickes v. Kress & Co.*, 398 U.S. 144, 190, 90 S.Ct. 1598, 26 L.Ed.2d 142 (opinion of Brennan, J.)).

 Consequently, in a particular application whose result would enable the most culpable official wrongdoers to escape liability altogether, a state statutory scheme whose primary design is to achieve equity in apportioning liability among any and all joint tortfeasors, and thereby preventing windfalls for the injured persons, may be at odds with a § 1983 deterrent policy that is imbued with larger purpose. The latter statute, while properly compensating the victims, among its underlying ends also seeks to put a price on a particular type of official wrongdoing and to deter a specified class of offenders in order to prevent future abuses by them and others.

The single-compensation approach Yokemick advocates as embodied in G.O.L. § 15–108 would produce precisely such inconsistency with federal policy in this case. It would allow the nonsettling wrongdoer full credit for the amount others paid, thereby entirely relieving him from any obligation to compensate the extent of the injuries he caused. Thus, in the name of avoiding unjust enrichment for the plaintiff, that result in essence would effectuate a windfall to the defendant. *See Rose v. Associated Anesthesiologists*, 501 F.2d 806, 809 (D.C.Cir.1974). As the D.C. Circuit stated in *Rose:*

> The one-compensation rule, grounded in unjust enrichment, is not to be applied in such a way as to generate unjust enrichment to the only litigating defendant ... It would be unjust enrichment ... to give the only defendant who was

eventually found liable ... a full *pro tanto* credit for the full amount paid by the others.

*Id.* at 809.

Such a consequence may yield other perverse implications, especially in circumstances such as those evidenced in this case. Here, the settlement was entered into on behalf of a group of defendants that consisted of the City itself and component agencies, as well as at least 19 individual City employees. Presumably, these included the other officers dispatched to the scene of the incident; those who transported Banks to the police station and the hospital; as well as personnel at the precinct. By any fair measure, the causal role and grade of culpability of these actors were relatively smaller, and in fact a reasonable jury could find that they pale in comparison with Yokemick's. Yokemick was not only the central player who set the events in motion, but, as a police officer himself, the one whose official misbehavior especially deserved to be deterred as an example to others and in recognition of the adverse societal implications of his offenses escaping all civil penalty. Here, a fair assessment of the evidence could support a finding demonstrating that where the acts of many of the other defendants were secondary and passive, Yokemick's were primary and active, approaching intentional misconduct rather than mere negligence.

 Application of G.O.L. 15–108 as Yokemick urges ignores not only the deterrent value but a dimension of equitable considerations also inherent in § 1983 analysis. The principles of fairness embodied in § 1983 recognize two entirely distinct concepts: that the fairness in the defendant paying the victim "rests not solely on the fact that the injured party deserves compensation, but also on the fact that the tortfeasor deserves to pay."

*Dobson I,* 705 F.2d at 769; *see also Owen,* 445 U.S. at 654, 100 S.Ct. 1398 ("Elemental notions of fairness dictate that one who causes a loss should bear the loss."). Thus, whether a particular offender may risk paying more than a mathematically precise portion of the plaintiff's total recovery, or whether the injured person in some instances may be overcompensated, is of lesser moment in the context of § 1983 damages analysis than that the nonsettling defendant be obliged to share in compensating the victim's losses in a way reflecting the wrongdoer's proportionate culpability. As the Supreme Court recognized in *McDermott:*

> Even if ... the proportionate share approach would overcompensate [plaintiff], we would not apply the one satisfaction rule. The law contains no rigid rule against overcompensation. Several doctrines ... recognize that making tortfeasors pay for the damage they cause can be more important than preventing overcompensation .... [A] plaintiff's good fortune in striking a favorable bargain with one defendant gives other defendants no claim to pay less than their proportionate share of the total loss.

*McDermott,* 511 U.S. at 219–20, 114 S.Ct. 1461.

Consequently, a *pro tanto* allocation rule that would allow the most culpable offender to avoid all obligation to share in the damages his official misconduct caused to the injured person serves neither the deterrent aim nor the fairness principles § 1983 incorporates. In this manner, that particular application of the setoff rule would lift a state law's economic policies and administrative and equitable priorities higher in rank over federal constitutional objectives that rightfully should manifest superior standing in the Court's application of § 1983.

Finally, the single satisfaction *pro tanto* setoff rule applied here to fully discharge the judgment against Yokemick may work against two other policy ends articulated by the *McDermott* Court as considerations favoring the proportionate share technique in apportioning damages: promotion of settlement and judicial economy. *See McDermott,* 511 U.S. at 211, 114 S.Ct. 1461. As evidenced here, in some cases the dynamics of litigation may induce the defendants who play the relatively lesser roles and face smaller exposure to settle jointly and thereby avoid risking additional costs and potential liability disproportionate to their contribution to the plaintiff's injury. On the other hand, the defendant who triggers the underlying events and apparently bears the largest share of the responsibility as causal agent of the injured party's loss, and who thus possesses the greatest financial stake in the outcome, may be encouraged to hold out of settlement. Instead, that defendant may choose to proceed to trial in the hope of obtaining complete pecuniary absolution in the event a verdict against him does not exceed the amount of the collective settlement reached on behalf of the lesser participants.

Yokemick cites *Apple,* 829 F.2d at 326, and *Mason,* 949 F.Supp. at 1068, for the proposition that G.O.L. § 15–108 has been recognized in this Circuit as authorizing the *pro tanto* setoff rule he contends applies to this case. *Apple* involved the application of G.O.L. § 15–108 in a medical malpractice case grounded solely on state law. No issue raising federal/state choice of law conflict under §§ 1983 and 1988 was involved. To this degree the case is not only distinguishable, but entirely inapposite to the matter at hand.

*Mason* was a § 1983 action based on false imprisonment. And the court did consider the applicability of G.O.L. § 15–

108. Defendants there were found liable for damages totaling $210,000. Prior to trial, the City of New York, one of the original defendants, reached a settlement with plaintiff for an amount of $145,000. The court reduced the plaintiff's recovery from the nonsettling defendants by that amount, finding that under these circumstances a setoff would not conflict with the policies underlying §§ 1983 and 1988.

The court carefully limited its conclusion to the facts before it, noting that because the City's settlement was less than the total damages assessed against the trial defendants, the plaintiff would still be made whole and the nonsettling defendants would still be obligated to pay a portion of the total damages. *See Mason,* 949 F.Supp. at 1078. The *Mason* court specifically declined to address the obverse situation. *See id.* ("The question whether Section 15–108 may be applied in a Section 1983 case where the amount of the settlement is less than the settling defendants' equitable share of the damages—and the effect of the setoff would be to leave the plaintiff less than whole—will be left for another day.").

*Mason* is distinguishable from the matter at hand in other respects. Unlike the dual plaintiffs and multiple violations entailed in this action at the time of the Settlement, *Mason* involved the claims of a single plaintiff and the court found only one injury from the constitutional deprivation at issue. *See id.* at 1076. Nor did the *Mason* court have occasion to consider the particular variant of the fact pattern now before this court—the same presented by

*Dobson I*—which entails a total credit against a settlement that would allow the nonsettlor in a § 1983 case to deflect liability altogether.

Moreover, *Mason* makes no mention of *McDermott.* It is therefore unclear whether the court considered the relevance of the case at all. Nor is it possible to speculate whether, if the court did not take account of *McDermott's* analysis and implications, it would have ruled the same way had it done so.

Accordingly, the Court concludes that application of G.O.L. § 15–108 to the circumstances of this case is inconsistent with the policies § 1983 was intended to promote, and that Yokemick is not entitled to the full setoff he claims under the state statute.

## B. PROCEDURE

Application of the proportionate share setoff rule here presents a number of procedural complications that must be addressed. First, the Amended Complaint in this case encompassed not only the claims brought on behalf of Banks's estate to redress injuries to Banks, but also causes of action Ms. Banks herself asserted to remedy whatever rights she may have had under applicable laws.[11] Ms. Banks's Stipulation of Settlement (hereinafter the "Settlement") with the City and the other defendants appears to cover both claims, though not unambiguously. For example, the Settlement, and the Rule 68 Offer of Judgment upon which it is grounded, refer to "plaintiff" in the singu-

---

**11.** In the Amended Complaint Ms. Banks asserts three causes of action in her individual capacity: two state law claims alleging negligent infliction of emotional distress and violation of due process under the State Constitution, and a federal claim under § 1983 for deprivation of her Due Process interest in the companionship of her son. (Amended Complaint ¶ 91, 104–05, 108–11.). None of these claims was the subject of a formal dispositive motion and ruling, although in correspondence with the Court and discussions at pretrial conferences Yokemick and the City questioned the legal basis for Ms. Banks's Due Process claims.

lar and suggest that the underlying claims settled are those arising out of the core events relating to Banks's arrest, injuries and ensuing death.

On the other hand, Ms. Banks contends in connection with the instant matter that the Settlement covered only the claims the complaint asserted in her individual capacity to remedy her own injuries, not those of Banks. *See* Pl. Memo at 13–14. In either event, the Settlement contains no apportionment of the $750,001 as between recovery related to the causes of action asserted by Ms. Banks on behalf of Banks's estate as opposed to those attributable to the injuries she claimed in her personal capacity. Nor does the agreement appear to impose on Ms. Banks any obligation to make such an allocation.

Second, for any setoff rule to apply, whether state or federal, the settlement must be predicated on the tortfeasors' liability for damages attributable to the same injury. *See Dobson II,* 725 F.2d at 1005; *Mason,* 949 F.Supp. at 1076 (citing *United States v. Alcan Alum. Corp.,* 990 F.2d 711, 722 (2d Cir.1993)); *Goad,* 730 F.Supp. at 1432; *Roma,* 481 N.Y.S.2d at 812. Here, the Settlement covered not only multiple other defendants but multiple actions alleging several injuries, not all of which entailed torts for which all defendants were necessarily jointly and severally liable.

For example, the core of the claims against Yokemick derives from his use of excessive force in the course of arresting Banks, and unreasonably delaying Banks's obtaining adequate medical assistance. The claims against other police officers did not implicate use of excessive force, but the participation of some may have extended to the medical attention count. The Amended Complaint also asserted false arrest and unlawful imprisonment charges that presumably would have applied to the roles of some of the individual defendants but not necessarily to all. A claim against the City for negligent hiring and training involved potential liability for the municipality as employer, but would not be applicable to the individual defendants. Moreover, the Amended Complaint also included as defendants unnamed police officers referred to as John Does # 1–10 whose identities were unknown as of the time of the Settlement. Finally, the Settlement provides for the dismissal and release by Banks and Ms. Banks of any potential claims against employees and agents of the New York City Health and Hospitals Corporation.

The import of these variables is that the amount of the Settlement embodied value attributable to claims that Banks and Ms. Banks agreed to drop against numerous other parties, and consideration the City paid to preclude its potential exposure to any other litigation that the action might have engendered. It is reasonable to assume that some part of the Settlement funds could be fairly apportioned to claims and potential liability unrelated to Yokemick's share of Banks's and Ms. Banks's asserted injuries, and that independently of how it responded to Yokemick's role in the alleged injuries, the City may have had sufficient interest in separately resolving these other matters amicably.

■ Third, any finding of comparative liability must be made by the trier of fact. *See McDermott,* 511 U.S. at 217, 114 S.Ct. 1461 (instructing that under the proportionate share approach, "the allocation [of comparative responsibility] will take place at trial"). In this case there was no jury charge nor jury findings apportioning relative causation and fault upon which an individual allocation of damages among defendants may be made.

On this point, the issue of setoff is an affirmative defense. *See Monaghan v. SZS 33 Assocs., L.P.,* 73 F.3d 1276, 1282 (2d Cir.1996). Yokemick therefore had the burden of proof on the matter. *See Gravatt,* 73 F.Supp.2d at 441 ("Under New York law, when a defendant argues that other parties share liability for a tort, the defendant has the burden of proving the parties' individual degrees of fault .... There is no reason why that burden should be any different under federal law."); *see also Dobson I,* 705 F.2d at 771 ("[T]he party claiming a reduction in judgment has the burden of proving that another party, though joined as a defendant, shares the blame for having caused the injury. Absent proof one way or the other, we would allow no reduction.")

Thus, even under Yokemick's theory that G.O.L. § 15–108 applied here to entitle him to full setoff of the jury's award against the Settlement, Yokemick was obligated to establish by a preponderance of the evidence the comparative shares of responsibility among other defendants involved in causing the injuries for which the jury found liability, so that a determination could be made regarding which rule would produce the greater credit. *See* G.O.L. § 15–108.

Fourth, Yokemick did not plead setoff as an affirmative defense in his Answer or Answer to Amended Complaint, nor did he include any reference to it in the defenses listed in the Joint Pretrial Order. Nonetheless, in a letter to the Court dated April 25, 2001 and at a pretrial conference on May 11, 2001 Yokemick requested leave to amend his answer to assert a setoff defense under G.O.L. § 15–108. The Court, questioning the appropriateness of permitting Yokemick to bring to the jury's attention during opening arguments the existence and amount of Ms. Banks's Settlement with the City, invited the parties to brief the legal issues involved as to the G.O.L. § 15–108 issue and to return with any further views. (See Transcript of the Pretrial Conference on May 11, 2001, at 37.)

It was not until the last day of the trial, on May 18, 2001, that Yokemick renewed the issue of setoff (*See* Tr. at 832.) And even so, his theory apparently continued to be that insofar as the City originally was a co-defendant and had settled its claims, Yokemick was entitled under G.O.L. § 15–108 to Court approval of that Settlement in satisfaction of any liability the jury found against him. In this regard, his contentions made no mention of the liability of *other individual defendants,* their comparative causal roles and fault in Banks's injuries or the apportionment of different claims as between Banks's and Ms. Banks and among the various other defendants. Nor did Yokemick address the extent to which the Settlement resolved claims against the City exclusively for liability that would not have extended to Yokemick and thus applied to injuries distinct and separately compensable from those entailed in the claims asserted against Yokemick.

Thus, while Yokemick repeatedly argued that as a matter of law he was entitled to claim the benefit of GOL § 15–108, he provided no *factual* record establishing the basis upon which the Court, had it found the state law applicable, could determine the extent to which Yokemick could avail himself of it. At trial, for example, Yokemick did not offer any evidence or argument suggesting that Yokemick's liability should be diminished by the degree of participation of other defendants.[12] Final-

---

12. In view of the limitations on Yokemick's defense imposed by the preclusion Order, introduction of such evidence would have

ly, Yokemick did not submit any proposed jury charge concerning setoff, nor did he express specific objections on this basis to the court's instructions to the jury.

■ On these grounds, Banks contends that Yokemick has waived any right he may have had to assert setoff as a defense. With a reservation described below, the Court is inclined to agree. *See Gravatt*, 73 F.Supp.2d at 441 (holding that because defendant had "failed to meet the burden by failing to request an allocation of fault at trial" it was not entitled to a reduction of the judgement based on the plaintiff's settlement with the other defendants). Failure to offer proposed instructions or object to the court's charge on a particular point waives that objection, and precludes a later challenge to the verdict on post-judgment Rule 50 motions on any basis not raised by Rule 50(b) motion prior to the jury verdict. *See Lambert v. Genesee Hospital*, 10 F.3d 46, 53–54 (2d Cir.1993). Accordingly, to the extent Yokemick requested the Court to rule as a matter of law on his assertion of a right to setoff pursuant to GOL § 15–108, the Court concludes not only on the substantive grounds discussed above, but by reason of these procedural deficiencies as well that Yokemick is not entitled to a setoff on that basis.

Nonetheless, there remains an issue with substantial practical and legal implications that gives the Court pause, and may require further proceedings before the Court's decision in this regard may be deemed final. In fashioning the alternative federal rule of decision based on proportionate share of responsibility that it has determined should apply here, the Court is mindful that the approach it adopts was neither before the Court nor before the parties prior to trial. There-

fore, insofar as the proportionate share rule implicates comparative fault issues that are matters of fact for the jury, they were not properly presented to the jury. Absent a jury finding on comparative fault, the Court confronts the same dilemma the *Dobson I* panel encountered—that of holding a party to a procedure that did not exist prior to the trial. *See Dobson I*, 705 F.2d at 770.

For these reasons, the Court will reserve final judgment on this matter pending further proceedings and discussions with the parties with regard to a proper resolution of the issues raised here. Possible options may range from a stipulated agreement authorizing the Court to decide the issue of comparative fault—either on the current record or upon additional hearings—to a stipulated remittitur or even a jury trial limited to the apportionment of comparative cause/comparative fault for Banks's injuries.

## III. *INDEMNIFICATION*

Yokemick's third motion asserts that pursuant to G.M.L. § 50–k, he is entitled to indemnification from the City for the amount of any judgement entered against him in this action. Banks supports this application. The City, invited by the Court to express its view on this issue, has declined to do so pending the Court's ruling on Yokemick's post-trial motions with respect to the extent of Yokemick's liability, and the City's final determination as to whether it would indemnify Yokemick for any part of the judgment sustained herein.

In accordance with an understanding among the parties, Yokemick's request for indemnification was left to be considered in this Court as part of the instant action, as opposed to being pursued in New York State Court in a separate proceeding pur-

proved difficult. However, at no point did Yokemick seek to do so.

suant to Article 78 of the New York Civil Practice Law and Rules. In a related ruling, this Court set forth the framework for its consideration of this matter, specifically determining that the decision would be made as a matter of law by the Court without a jury. *See Banks,* 144 F.Supp.2d at 281–88.

In light of the City's view to withhold its final indemnification determination until the Court's ruling .on Yokemick's other motions here, the Court will reserve judgement on Yokemick's indemnification claim until the City has reached a final decision in this regard. Accordingly, the City will be directed to inform the Court and the parties herein of its determination. In the event the City decides to take no further action or to make no additional submission in this regard, within thirty days of the Court's Order herein, the Court will proceed to rule on Yokemick's indemnification claim on the basis of the record as it may then exist, or as supplemented by any further proceedings the Court may deem appropriate.

### ORDER

For the reasons set forth above, it is hereby

**ORDERED** that defendant Yokemick's post-trial motion for judgement as a matter of law pursuant to Fed.R.Civ.P. 50 is DENIED; and it is further

**ORDERED** that defendant Yokemick's motion for setoff pursuant to New York GOL § 15–108 is DENIED, subject to further proceedings specified in the Court's decision to determine the extent, if any, to which Yokemick may be entitled to setoff under the rule of decision the Court has determined is applicable, and it is further

**ORDERED** that the Court reserves decision on defendant Yokemick's motion for indemnification pursuant to New York G.M.L. § 50–k pending a determination by the City of New York as to whether it will indemnify Yokemick for any part of the judgment entered against him in accordance with the jury's verdict herein; and it is further

**ORDERED** that the City is directed to inform the Court and the parties herein of its determination as regards Yokemick's application for indemnification within thirty (30) days of the date of this **ORDER;** and it is further

**ORDERED** that in the event the City has not made a determination or submission to the Court concerning Yokemick's indemnification claim, the Court shall proceed to decide the matter on the basis of the record then before it; and it is finally

**ORDERED** that a conference with the court to consider the issues requiring the further proceedings specified in this Decision and Order is scheduled for December 11, 2001 at 2:30 p.m.

**SO ORDERED.**